Eugenia T. DONOVAN, Individually, and On Behalf of
All Others Similarly Situated, Petitioner *v.* Sharon
PRIEST, Secretary of State of the State of Arkansas,
Respondent; Arkansas Term Limits, Frank Gilbert, and
Spencer G. Plumley, Intervenors

96-1120                                    931 S.W.2d 119

Supreme Court of Arkansas
Opinion delivered October 21, 1996

*Friday, Eldredge & Clark,* by: *Paul B. Benham III, Elizabeth Robben Marray,* and *Robert S. Shafer,* for petitioner.

*Winston Bryant,* Att'y Gen., by: *Tim Humphries,* Deputy Att'y Gen., and *William F. Knight,* Ass't Att'y Gen., for respondent.

*Kelly Law Firm, PLC,* by: *A.J. Kelly,* for intervenors.

DONALD L. CORBIN, Justice. Petitioner, Eugenia T. Donovan, citizen and taxpayer, asks this court to enjoin Respondent, Secretary of State Sharon Priest, from placing the proposed Amendment 9 to the Arkansas Constitution on the ballot for the general election on November 5, 1996. Petitioner also requests that any votes that may have already been cast for the proposed Amendment 9 not be counted. We allowed the intervention of three additional parties in this original action, which was filed pursuant to Amendment 7 to the Arkansas Constitution of 1874: "Arkansas Term Limits," the unincorporated sponsor of the proposed Amendment 9; Frank Gilbert, Executive Director of "Arkansas Term Limits"; and Spencer G. Plumley, Chairman of "Arkansas Term Limits."

Petitioner asserts that the proposed Amendment 9 exceeds the legislative powers reserved to the people of this state by our Amendment 7 in that it directly contravenes the amendment process provided for in Article V of the United States Constitution. Respondent and Intervenors contend that the proposed Amendment 9 does not exceed the powers of the people reserved in Amendment 7 and that, even if it did, Petitioner's challenge to the proposal is a question of substantive constitutional law that is not yet ripe for our review. Our jurisdiction to hear this case is original and exclusive pursuant to Amendment 7 of the Arkansas Constitution.

## I. Justiciability

Respondent and Intervenors urge us to decline review of Petitioner's constitutional challenge to the proposed Amendment 9 because the issue is not ripe for adjudication and, as such, any opinion issued by this court on the matter would be purely advisory. Petitioner asserts that our review of the sufficiency of the petition for this proposed amendment, as provided in Amendment 7, necessarily encompasses the issue of whether the proposal is within the powers reserved to the people in Amendment 7. Petitioner argues that the people of this state do not have the right to

propose such a measure as the proposed Amendment 9, which instructs the legislators of this state, along with the Arkansas delegation to Congress, to use all the powers of their respective offices in proposing and securing an amendment to the United States Constitution limiting the number of terms members of Congress may serve. Petitioner asserts that the procedures for proposing amendments to the United States Constitution are specifically and exclusively provided for in Article V of that Constitution. Respondent and Intervenors counter that Petitioner's argument is nothing more than a substantive constitutional challenge to the proposal, and as such, our review of the issue is not proper unless and until the measure has become law.

Our reading of the proposed Amendment 9 indicates that it is procedural in nature, purporting to empower the electorate with an indirect and prohibited means to propose an amendment to the United States Constitution. Hence, we agree that the threshold issue presented requires an analysis of whether such a procedure is encompassed within the powers reserved to the people of this state in Amendment 7.

Amendment 7 to the Arkansas Constitution of 1874 provides in part:

> The legislative power of the people of this State shall be vested in a General Assembly, which shall consist of the Senate and House of Representatives, *but the people reserve to themselves the power to propose legislative measures, laws and amendments to the Constitution,* and to enact or reject the same at the polls independent of the General Assembly[.] [Emphasis added.]

Amendment 7 further provides that the sufficiency of statewide petitions for initiatives shall be decided in the first instance by the Secretary of State, subject to the review of the supreme court which has original and exclusive jurisdiction over such causes. Upon legal challenges to initiative matters, Amendment 7 places the burden of proof "upon the person or persons attacking the validity of the petition." As to the scope of Amendment 7 and its incorporation of the reserved rights of the people, this court has previously observed that "[t]he voters of this state essentially have, *within constitutional limits,* a right to change any law or any provision of our Constitution they deem appropriate through Amendment 7 to the

Constitution." *Dust v. Riviere*, 277 Ark. 1, 4, 638 S.W.2d 663, 665 (1982) (emphasis added). Clearly those constitutional limitations derive from both the United States Constitution and this state's constitution. On the federal level, the rights reserved to the states and to the people of the states originate from the Tenth Amendment to the United States Constitution, which provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." Thus, our Amendment 7 cannot empower the people of this state to initiate any measure, law, or amendment which falls outside the powers reserved to the states and their citizens by the United States Constitution. We understand this to be the essence of Petitioner's challenge.

This court has previously decided cases in which it reviewed the validity of the people's reserved powers of initiative and referendum. In *Czech v. Baer*, 283 Ark. 457, 677 S.W.2d 833 (1984), this court was presented with a challenge to the validity of a proposed local initiative. In determining that such a review of the initiative could be conducted by this court prior to the election, the majority opinion stated:

> At the outset the appellees argue that we should permit the measures to be placed on the ballot without first determining their validity. Certainly it is true that a party who resists an initiated petition on grounds such as insufficiency of signatures or improper ballot title is not required to question the validity of the proposed measure. On the other hand, *that question may be considered and decided when it is properly raised, even before the election. Proctor* v. *Hammans*, 277 Ark. 247, 640 S.W.2d 800 (1982); *Hodges* v. *Dawdy*, 104 Ark. 583, 149 S.W. 656 (1912).

*Id.* at 459, 677 S.W.2d at 835 (emphasis added).

In *Hodges* v. *Dawdy*, 104 Ark. 583, 149 S.W. 656 (1912), this court considered our state's previous Initiative and Referendum Amendment, which is comparable to our present-day Amendment 7, together with its enabling clause and determined that it was the duty of this court to determine the validity of a proposed amendment before such became law. The court concluded that it must determine whether the proposed measure is "*subject to the initiative power of the people*, and that the petition is legally sufficient[.]" *Id.* at

591, 149 S.W. at 659 (emphasis added).

■ More recently in *Plugge v. McCuen*, 310 Ark. 654, 841 S.W.2d 139 (1992), this court declined to address the petitioners' substantive constitutional challenge as to whether a proposed measure conflicted with the Qualifications Clause of the United States Constitution. The majority opinion did, however, acknowledge that this court had previously addressed constitutional challenges to a proposal's validity, but limited such review to situations where the proposed measure was "clearly contrary to law" and, therefore, should not be submitted to the electorate. *Id.* at 660, 841 S.W.2d at 142. In addition to the consideration of whether a proposed measure is "clearly contrary to law," this court has indicated that in determining whether an issue is justiciable, factors to be weighed include whether the issue at hand is a matter of significant public interest and a matter of constitutional law. *See U.S. Term Limits, Inc. v. Hill*, 316 Ark. 251, 872 S.W.2d 349 (1994); *Bryant v. English*, 311 Ark. 187, 843 S.W.2d 308 (1992).

■ It has been said that the pertinent issue in cases such as this one "is *not* the hypothetical question whether the law, if passed, would be constitutionally defective; rather, it is the present and ripe question whether the measure's proponents are entitled to invoke the direct legislation process at all." James D. Gordon III & David B. Magleby, *Pre-Election Judicial Review of Initiatives and Referendums*, 64 Notre Dame L. Rev. 298, 314 (1989) (emphasis added). We agree, especially when considering our decisions in *Czech, Hodges,* and *Plugge*. We also agree that a case such as this one is ripe for the following reasons: (1) The case is concrete and the record will not be improved by waiting until after the election is held; (2) the factual controversy — whether procedural and subject-matter requirements have been met — exists before the election; (3) postelection events will not sharpen the issues, as no additional facts are necessary for decision; and (4) the issue is not speculative nor hypothetical because the only constitutional issues involved are those that govern the proponents' right to invoke the direct-legislation process. *Id.*

■ Regarding justiciability in general, this court has previously stated that declaratory relief will lie where (1) there is a justiciable controversy; (2) it exists between parties with adverse interests; (3) those seeking relief have a legal interest in the controversy; and (4) the issues involved are ripe for decision. *U.S. Term*

*Limits, Inc.*, 316 Ark. 251, 872 S.W.2d 349. Here, there is clearly a case in controversy over the effect and application of the proposed Amendment 9 between parties with adverse interests. Certainly Petitioner as a citizen, resident, taxpayer, and registered voter has a legal interest in the controversy. As to the issue of ripeness, the federal courts have viewed it as largely a matter of timing. *Thorsted* v. *Gregoire*, 841 F. Supp. 1068 (W.D. Wash. 1994). In *Thorsted*, the district court pointed out that the United States Supreme Court has recognized the importance in deciding challenges to the constitutionality of election laws when it held that "[j]usticiability in such cases depends not so much on the fact of the past injury but on the prospect of its occurrence in an impending or future election." *Id.* at 1075 (quoting *Babbitt* v. *United Farm Workers Nat'l Union*, 442 U.S. 289, 300, n. 12 (1979)).

Other courts have conducted preelection reviews of a proposed measure's validity. In *Hawke* v. *Smith, No. 1*, 253 U.S. 221 (1920), the United States Supreme Court considered the issue of whether a proposed measure was constitutional under Article V of the United States Constitution before it had been enacted into law. The Supreme Court of California has interpreted *Hawke* as direct authority for the proposition that a state court can remove a proposed amendment from a state election ballot on the ground that it does not conform to Article V, and by implication, that a state court has authority to adjudicate that preelection question. *See, e.g., AFL-CIO* v. *Eu*, 686 P.2d 609 (Cal. 1984).

■ Based on the aforementioned decisions of this court as well as other courts, we hold that our review of the sufficiency of a proposed measure, as provided for in Amendment 7, includes a review of whether the measure's proponents are entitled to invoke the direct initiative process when such issue is properly presented. In so holding, we do not conclude that we will entertain substantive constitutional challenges to a proposed measure, such as whether it violates the free speech provision of the First Amendment, before an election has been held. We distinguish such substantive constitutional challenges from procedural challenges in that the former necessarily involve fact-specific issues and thus are not ripe for review until the proposed measure becomes law and a case in controversy arises. Given that the review we are asked to conduct in this case is not one of direct review of the proposed amendment's validity, but rather one of whether the proposed amendment's ad-

vocates are entitled to invoke our initiative process in the first place, we will address the merits of Petitioner's challenge. Our discussion of this issue necessitates our review of the powers authorized by Article V of the United States Constitution and the case law that has interpreted those powers.

## II. Constitutional Challenge

Article V of the United States Constitution provides in pertinent part:

> The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress[.]

The pertinent sections of the proposed Amendment 9 provide as follows:

> (e) It is the will of the people of the State of Arkansas that the following amendment be added to the United States Constitution:

> Congressional Term Limits Amendment

> Section a. No person shall serve in the office of United States Representative for more than three terms, but upon ratification of this amendment no person who has held the office of United States Representative or who then holds the office shall serve for more than two additional terms.

> Section b. No person shall serve in the office of United States Senator for more than two terms, but upon ratification of this amendment no person who has held the office of United States Senator or who then holds the office shall serve more than one additional term.

> Section c. This article shall have no time limit within which it must be ratified by the legislatures of three-fourths of the several states.

. . . .

(g) Each member of the Arkansas delegation to the United States Congress *is hereby instructed to use all of the powers of the Congressional office to pass the Congressional Term Limits Amendment* set forth in subsection (e) above.

(h) All primary, general, and special election ballots *shall have* the information "DISREGARDED VOTER IN-STRUCTION ON TERM LIMITS" printed adjacent to the name of any United States Representative or United States Senator who:

(1) Failed to vote in favor of the Congressional Term Limits Amendment proposed in subsection (e) when brought to any vote;

(2) Failed to second the Congressional Term Limits Amendment proposed in subsection (e) if it lacked for a second before any proceeding of the legislative body;

(3) Failed to propose or otherwise bring to a vote of the full legislative body the Congressional Term Limits Amendment proposed in subsection (e) above if it otherwise lacked a legislator who so proposed or brought to a vote of the full legislative body the Congressional Term Limits Amendment proposed in subsection (e) above; or

(4) Failed to vote in favor of discharging the Congressional Term Limits Amendment proposed in subsection (e) before any committee or subcommittee upon which the legislator served in the respective legislative body; or

(5) Failed to vote against or reject any attempt to delay, table, or otherwise prevent a vote by the full legislative body on the Congressional Term Limits Amendment set forth in subsection (e); or

(6) Failed to vote against any term limits proposal with terms longer than those set forth in the Congressional Term Limits Amendment proposed in subsection (e); or

(7) Sponsored or co-sponsored any proposed constitutional amendment or law that proposes term limits longer than those in the Congressional Term Limits Amendment set forth in subsection (e); or

(8) Failed to ensure that all legislative votes on congressional term limits were recorded and made available to the public.

. . . .

(k) The House of Representatives of the State of Arkansas, and the Arkansas Senate, due to the desire of the people of the State of Arkansas to establish term limits for the Congress of the United States, *are hereby instructed to make the following application to the United States Congress, pursuant to their powers under Article V of the United States Constitution,* to wit:

"We, the people and legislature of the State of Arkansas, due to our desire to establish term limits on the members of the Congress of the United States, hereby make application to the United States Congress, pursuant to our power under Article V of the United States Constitution, to call a convention for proposing amendments to the Constitution."

. . . .

(1) All primary, general, and special election ballots *shall have* the information "DISREGARDED VOTER INSTRUCTION ON TERM LIMITS" printed adjacent to the name of any state senator or state representative who:

(a) Failed to vote in favor of the application set forth in subsection (k) above when brought to a vote; or

(b) Failed to second the application set forth in subsection (k) above if it lacked a second; or

(c) Failed to vote in favor of all votes bringing the application set forth in subsection (k) above before any committee or subcommittee upon which the legislator served; or

(d) Failed to propose or otherwise bring to a vote of the full legislative body the application set forth in subsection (k) if it otherwise lacked a legislator who so proposed or brought to a vote of the full legislative body the application set forth above; or

(e) Failed to vote against any attempt to delay, table, or otherwise prevent a vote by the full legislative body on the

application set forth in subsection (k) above; or

(f) Failed to ensure that all votes on the application set forth in subsection (k) were recorded and made available to the public; or

(g) Failed to vote against any change, addition, or modification to the application set forth in subsection (k) above; or

(h) Failed to attend a hearing, session, or vote of the legislative body concerning any aspect of consideration of the proposals in subsection (e) and subsection (k) above, where such failure to attend resulted in any failure to obtain a quorum sufficient to conduct business; or

(i) Failed to move for, second, or vote in favor of a roll-call vote on any aspect of consideration of the proposals in subsection (e) and subsection (k) above, where such failure resulted in the defeat of any aspect of subsection (e) and subsection (k) above, without recording the votes of individual legislators to be held accountable at a later time.

(j) Failed to vote against any effort to rescind the application.

(k) Failed to vote in favor of the amendment set forth in subsection (e) above, when the amendment was sent to the states for ratification; or

(l) Failed to vote against any term limits amendment with terms longer than the limits set forth in the proposed amendment in subsection (e) above, when such an amendment is sent to the states for ratification.

. . . .

(n)(1) The Secretary of State of the State of Arkansas shall be responsible for making an accurate determination as to whether a candidate for state or federal legislative office shall have placed next to the candidate's name on the election ballot the information "DISREGARDED VOTER INSTRUCTION ON TERM LIMITS" or the information "DECLINED TO PLEDGE TO SUPPORT TERM LIMITS" and for certifying the appropriate indication to the appropriate county clerks and other appropriate voting offi-

cials. [Emphasis added.]

It is clear from the aforementioned provisions that the proposed Amendment 9, which bears the popular name "THE CONGRESSIONAL TERM LIMITS AMENDMENT OF 1996," directs both state and federal legislators to use the power of their respective offices to advance the cause of adopting a proposed amendment to the United States Constitution that would limit the number of terms of United States Representatives and Senators. The proposed Amendment 9 also directs the General Assembly to use the power specifically granted to the state legislatures in Article V to ask the United States Congress to call a constitutional convention. The proposed Amendment 9 essentially provides for a vote of the people to initiate the application process for a constitutional convention and, likewise, it provides for a vote of the people to propose to Congress an amendment to the United States Constitution. In the event any individual legislator, state or federal, fails to do as instructed, the proposed Amendment 9 states that the words "DISREGARDED VOTER INSTRUCTION ON TERM LIMITS" shall be placed adjacent to their names on any ballots in future elections.

Respondent and Intervenors assert that the proposed Amendment 9 does not contravene Article V because it neither prevents nor compels any action by any legislator, state or federal; it merely puts the legislators on notice of the desire of the people to have term limits on members of Congress. Further, Respondents and Intervenors assert that the main focus of this proposed amendment is its provision for additional ministerial duties of the Secretary of State, and that there is no binding effect on any legislative power nor any penalty assessed to legislators. As discussed earlier, we limit our review to the only justiciable issue — whether Amendment 7 reserves to the people of the State of Arkansas the power to propose amendments to the United States Constitution and to make application to Congress for a constitutional convention. In order to resolve this issue, it is helpful to review the case law interpreting the provisions of Article V.

In *Hawke*, 253 U.S. 221, the Supreme Court determined that a provision of the Ohio constitution extending the referendum to the ratification process of proposed amendments to the United States Constitution was in conflict with Article V. The Court stated that Article V provides for the proposal of constitutional amend-

ments only by votes of two-thirds of both houses of Congress or upon application of the legislatures of two-thirds of the states, "thus securing deliberation and consideration before any change can be proposed." *Id.* at 226. The Court further stated that "[t]he language of the article is plain, and admits of no doubt in its interpretation. It is not the function of courts or legislative bodies, national or state, to alter the method which the Constitution has fixed." *Id.* at 227. The Court defined the term "legislatures" as the representative body which makes the laws of the people — *not* the people themselves. *Id.* In concluding that the power to ratify a proposed amendment to the United States Constitution is derived from that Constitution, the Court wrote:

> It is true that the power to legislate in the enactment of the laws of a State is derived from the people of the State. But the power to ratify a proposed amendment to the Federal Constitution has its source in the Federal Constitution. *The act of ratification by the State derives its authority from the Federal Constitution to which the State and its people have alike assented.*

*Id.* at 230 (emphasis added). Ultimately, the Court held that Article V only authorized state legislatures (i.e. the law-making bodies themselves) to ratify amendments to the United States Constitution. The Court thus concluded that the people, through the process of initiative and referendum, did not have the same power.

Two years after the decision in *Hawke*, the Supreme Court had another occasion to address the ability, or lack thereof, of the people of the states to ratify a proposed amendment to the United States Constitution. In *Leser v. Garnett*, 258 U.S. 130 (1922), the Court held that any measure which purports to place the power to ratify proposed amendments to the United States Constitution in the hands of the people of the states, and which takes such power away from the state legislatures is unconstitutional because it conflicts with Article V. The Court held:

> [T]he function of a state legislature in ratifying a proposed amendment to the Federal Constitution, like the function of Congress in proposing the amendment, is a *federal function* derived from the Federal Constitution; and it *transcends any limitations sought to be imposed by the people of a State.*

*Id.* at 137 (citations omitted) (emphasis added).

Respondent and Intervenors argue that neither *Hawke* nor *Leser* is applicable to the situation presented in this case because both cases pertain only to the ratification clause of Article V. Instead, they assert that *Kimble* v. *Swackhamer*, 439 U.S. 1385 (Rehnquist, Circuit Justice 1978) is controlling. Their reliance on *Kimble* is misplaced, however, as the factual scenario presented in *Kimble* is opposite to that in the instant case. In *Kimble*, the Nevada state legislature had requested an advisory referendum from the people as to their positions on the proposed Equal Rights Amendment to the United States Constitution, ostensibly for the purpose of polling their constituents. Justice Rehnquist, acting in his capacity as Circuit Justice, concluded that the citizen participation in the amendatory process in that particular instance was not unconstitutional because of the *nonbinding* character of the referendum. While acknowledging the soundness of the previous holdings in *Hawke* and *Leser*, Justice Rehnquist concluded that neither of those cases ruled out "communication" between legislators and their constituents. *Id.* at 1387-88. That is not the case with proposed Amendment 9, which we conclude goes beyond a mere advisory referendum or a nonbinding communication between legislators and citizens.

In *State ex rel. Harper* v. *Waltermire*, 691 P.2d 826 (1984), the Supreme Court of Montana considered the issue of whether the people of that state could dictate to the state legislature that an application be made to Congress to call a constitutional convention. Specifically, the proposed ballot measure, not unlike the one at hand, directed the Montana Legislature to submit application to Congress for a constitutional convention in order to propose a balanced-budget amendment to the United States Constitution. The measure further provided that if the state legislature failed to make such application within ninety days, it had to remain in session, with only three days of permissible recess and without pay to the legislators until such application was made.

Relying on the holdings of *Hawke* and *Leser*, the Montana court held that the word "legislatures," as used in both the ratification clause and the proposal clause of Article V, referred to the legislative bodies of the states. The court reasoned that the framers of the United States Constitution would not have ascribed different meanings to the two instances in Article V where the word "legislatures" is found. The court further echoed the framers' sentiments that the amendatory process should be deliberate, holding that

"whenever a state legislature acts to amend the United States Constitution under Article V powers, the body must be a deliberative representative assemblage acting in the absence of any external restrictions or limitations." *State ex rel. Harper*, 691 P.2d at 830.

The sponsors of the Montana measure argued, just as Respondent and Intervenors do in this case, that the initiative was merely a nonbinding recommendation to the legislature. In rejecting that argument, the Montana court pointed to the express language directing the actions of the legislature as well as the consequences for not following those directions, namely that the legislature would be kept in "perpetual session" and, after a period of ninety days, legislators would no longer receive compensation. *Id.* The court determined that such restrictions violated the spirit of Article V as interpreted in *Hawke* and *Leser*. Finally, the court concluded that "[l]egislative deliberation cannot exist where the outcome is a predetermined specific action. . . . The people through initiative cannot affect the deliberative process." *State ex rel. Harper*, 691 P.2d at 830-31.

In *Eu*, 686 P.2d 609, the Supreme Court of California considered the constitutionality of a similar proposed ballot measure. The proposed measure at issue there would have compelled the California Legislature, on penalty of loss of salary, to apply to Congress to call a constitutional convention for the purpose of proposing a balanced-budget amendment. In concluding that the proposed measure did not conform to Article V of the United States Constitution, the court stated:

> Article V provides for application by the "Legislatures of two-thirds of the several States," not by the people through the initiative; it envisions legislators free to vote their best judgment, responsible to their constituents through the electoral process, not puppet legislators coerced or compelled by loss of salary or otherwise to vote in favor of a proposal they may believe unwise.

*Id.* at 613.

The California court reasoned that the purpose of that state's initiative process is to allow a means of enacting legislation, *not* a means of conducting public opinion polls. The court stated that the voters were not without remedy, as they had ample opportunity to make their views known to the various candidates through the

campaign process. The court acknowledged that the United States Supreme Court had not yet addressed this particular issue involving Article V's proposal clause, but it found the Court's previous interpretations of Article V's ratification clause to be persuasive. Furthermore, the court cited with approval an earlier determination by the Supreme Judicial Court of Massachusetts that the reference to "legislatures" in the proposal clause, like that in the ratification clause, meant the legislative body of a state, not the whole legislative process. *Eu*, 686 P.2d at 620 (citing *Opinion of the Justices to the Senate*, 366 N.E.2d 1226 (Mass. 1977)).

The California court further submitted that the framers of the United States Constitution knew exactly what distinction they were making in providing that only "Legislatures" were able to make application to Congress to convene a constitutional convention. Relying on the constitutional analysis in *Hawke*, 253 U.S. 221, and *Barlotti v. Lyons*, 189 P. 282 (Cal. 1920), the court wrote:

> The framers were, of course, aware of the difference between a representative body and the electorate as a whole; they knew that a legislature is a deliberative body, empowered to conduct hearings, examine evidence, and debate propositions. Its members may be assumed generally to hold views reflecting the popular will, but no one expects legislators to agree with their constituents on every measure coming before that body. Yet, although undoubtedly aware that the views of a deliberative body concerning a proposed amendment might depart from those of a majority of the voters, *the framers of the Constitution chose to give the voters no direct role in the amending process*; legislatures alone received the power to apply for a national convention, and legislatures or conventions, as Congress chose, the power to ratify amendments.
>
> The only conclusion we can draw from this fact is that the drafters wanted the amending process in the hands of a body with the power to deliberate upon a proposed amendment and, after considering not only the views of the people but the merits of the proposition, to render a considered judgment. *A rubber stamp legislature could not fulfill its function under article V of the Constitution.*

*Eu*, 686 P.2d at 621 (footnote omitted) (emphasis added).

Most recently, the Supreme Judicial Court of Maine was asked by its house of representatives for an opinion on a proposed initiative measure comparable to the proposed Amendment 9. In *Opinion of the Justices*, 673 A.2d 693 (1996), the Maine court stated that neither the electors of that state nor the state's legislature may control the delegates to Congress in the performance of their duties, because "[s]uch an exercise of control would violate the essence of federalism." *Id.* at 696. The court recognized that once elected by the people of the state, Congressional representatives act on behalf of the nation as a whole. *Id.* In reviewing the proposed initiative under the provisions of Article V, the court held that "it is not within the power of the electors to propose a constitutional amendment. The proposed initiative, if enacted by a referendum vote, would allow the electors to do indirectly that which they are forbidden to do directly." *Id.* at 697.

These three cases from Montana, California, and Maine, along with the Supreme Court cases interpreting Article V's ratification clause, are persuasive authority for Petitioner's proposition that Article V prohibits the action proposed by the measure at hand. Clearly, the proposed Amendment 9 is nothing more than a coercive attempt to compel the Arkansas General Assembly to do as the alleged majority of the people wish, without any intellectual debate, deliberation, or consideration of whether such action is in the best interest of all the people of this state. This intent is clear from the language of the proposed Amendment 9 that the legislators *are hereby instructed* to do as told. Although the proposed Amendment 9 does not compel such action by the legislature on threat of loss of salary, it is nonetheless binding on the legislators in an extortive manner as failure to heed the amendment's instructions will result in their threatened potential political deaths. Contrary to what Respondent and Intervenors contend, the proposed duties to be given to the Secretary of State by Amendment 9 are not merely ministerial; rather, they amount to substantive penalties that are equivalent to an officially sanctioned recommendation by the State of Arkansas not to vote for such candidates because they disregarded the instructions and wishes of the voters. If, as Respondent and Intervenors assert, the proposed measure is merely a nonbinding attempt to communicate the desire of the people for term limits, then their remedy is to voice their desires at the polls by voting for candidates who share these beliefs.

■ The proposed Amendment 9 is clearly violative of the provision in Article V of the United States Constitution that all proposals of amendments to that Constitution must come either from Congress or state legislatures — not from the people. It is an indirect attempt to propose an amendment to the United States Constitution, and as such violates the narrow, specific grants of authority provided in Article V. The proposed Amendment 9 would virtually tie the hands of the individual members of the General Assembly such that they would no longer be part of a deliberative body acting independently in exercising their individual best judgments on every issue. Consequently, the measure is an impermissible use of the initiative power reserved to the people of this state in Amendment 7 to the Arkansas Constitution and is clearly contrary to law. See *Plugge*, 310 Ark. 654, 841 S.W.2d 139.

■ Intervenors raise the issue in their reply brief that placing the information "DISREGARDED VOTERS INSTRUCTION ON TERM LIMITS" adjacent to candidates' names on election ballots is constitutionally permissible as a time, place, and manner regulation under the Elections Clause of Article 1, Section 4, of the United States Constitution. Because we conclude that the proposed Amendment 9 exceeds the scope of the powers reserved to the people in Amendment 7, we need not address this issue. We thus enjoin Respondent from placing the proposed Amendment 9 on the ballot, or alternatively from declaring the results. The mandate is ordered issued on Friday, October 25, 1996, unless a petition for rehearing is filed. If a petition for rehearing is filed, briefing will be on an expedited basis to be set by the clerk.

Petition granted.

GLAZE, J., concurs in the result reached.