Brenda THIEL, President of the League of
Women Voters of Arkansas, Inc. *v.* Sharon
PRIEST, in Her Official Capacity as Secretary
of State of Arkansas and Ex-officio Secretary
of the State Board of Election Commissioners

00-1041 28 S.W.3d 296

Supreme Court of Arkansas
Opinion delivered October 12, 2000

*Robert D. Smith III*; and *Tom Tanner*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Dennis R. Hansen*, Ass't Att'y Gen.; and *Tim Humphries* for appellee.

Tom Glaze, Justice. In its 1999 regular session, the General Assembly enacted a number of statutory changes to require statewide county reappraisals over the next three years. *See, e.g.,* Acts 1185, 933, and 974 of 1999. Concerned that these reappraisals would cause significant increases in assessed valuation and taxes, the General Assembly sought to limit the impact of such appraisals. In doing so, pursuant to art. 19, § 22, of the Arkansas Constitution, it adopted a proposed constitutional amendment

(hereafter proposed Amendment No. 2). The amendment's announced primary purpose, as set out in the proposal's popular name and ballot title, is to limit the increase in the assessed value of a taxpayer's real property after a county-wide appraisal. The General Assembly proposed the referred amendment by adopting House Joint Resolution 1015, and, while not required under art. 19, § 22 to provide a ballot title, it did so. The Attorney General designated the proposal Amendment No. 2 and declared (added) a popular name to the amendment as required by Ark. Code Ann. § 7-9-110 (Repl. 2000).

On August 25, 2000, Brenda Thiel, an Arkansas registered voter and the President of the League of Women Voters of Arkansas, Inc., filed a timely complaint in the Pulaski County Circuit Court requesting a declaratory judgment and a writ of mandamus. Thiel requested the circuit court to declare that Amendment No. 2's popular name and ballot title are unintelligible as to the proposal's scope and import and that the ballot title is materially incomplete and misleading to the extent that it is a manifest fraud on the public. Thiel also asked the lower court to rule Amendment No. 2 unconstitutional because it violates the Fourteenth Amendment. She further alleged these above defects required the trial court to order the Secretary of State not to certify or place Amendment No. 2 on the November 7, 2000, General Election ballot, but if the proposed amendment already appears on the ballots, the votes cast on the measure should not be counted and certified.

Thiel recognized that proposed measures under art. 19, § 22, are reviewed by the courts by a "manifest-fraud-on-the-public" standard. However, in further support of her allegations and requests, Thiel urged the circuit court to review the sufficiency of Amendment No. 2's ballot title under the less rigorous standard of review employed when this court considers initiative constitutional proposals under Amendment 7 to the Arkansas Constitution, namely, that the ballot title should be (1) intelligible, (2) honest, and (3) impartial. *See Becker v. McCuen*, 303 Ark. 482, 789 S.W.2d 71 (1990).

In denying all of Thiel's requests, the circuit court ruled its standard of review in analyzing art. 19, § 22, proposals is to determine whether Amendment No. 2's ballot title was so deficient that it amounted to a manifest fraud on the public. Based on this stan-

dard, the lower court upheld the proposal's ballot title. The trial court went further, however, and determined that it would conclude the measure's ballot title sufficient and not misleading even when it used the broader but less demanding standard employed by our court in reviewing Amendment 7 initiative measures. Additionally, the trial court refused to reach Thiel's arguments that the proposed amendment violates the equal protection clause of the Fourteenth Amendment; it reasoned that this issue would not be ripe for review unless such proposal is approved and enacted into law by the Arkansas voters. Thiel brings this appeal from the lower court's rulings, claiming the trial court erred in failing to find or hold (1) the Amendment 7 standard of review was controlling, and (2) the ballot title was defective under the Amendment 7 standard. She further contends the circuit court should have decided that the proposed amendment violates the Fourteenth Amendment.

■ ■ In making her first argument, Thiel recognizes the enormous hurdle she must overcome to show Amendment No. 2's ballot title constitutes a manifest fraud. As she points out, our court has defined fraud as meaning (1) a false representation of a material fact; (2) knowledge that the representation is false or that there is insufficient information upon which to make the representation; (3) intent to induce action or inaction on the representation; (4) justifiable reliance on the representation; and (5) damage suffered as a result of the reliance. *See McAdams v. Ellington,* 333 Ark. 362, 970 S.W.2d 203 (1998). Moreover, Thiel offers *Black's Law Dictionary's* (6th ed. 1990) definition of the term "manifest" to mean something that is "evident to the senses, especially to the sight, obvious to the understanding, evident to the mind, not obscure or hidden, and is synonymous with open, clear, visible, unmistakable, indubitable, indisputable, evident, and self-evident. In evidence, that which is clear and requires no proof; that which is notorious." In applying these defined terms to a review of ballot titles, Thiel surmises that she cannot imagine a time when a majority of the General Assembly would intentionally misrepresent a ballot title so as to bring a ballot title within the definition of manifest fraud. For this reason, Thiel asks us to discard this court's manifest-fraud standard used in art. 19, § 22, reviews, and instead use the Amendment 7 standard in its place. This exact argument was raised but rejected in a four-to-three decision in the case of *Becker v. Riviere, Secretary of State,* 277 Ark. 252, 641 S.W.2d 2 (1982). Thiel now asks us to overrule that

decision. She additionally points to our opinion in *Becker*, 303 Ark. 482, 789 S.W.2d 71, where this court questioned the propriety of having two different review standards when evaluating ballot titles, and further opined that, at our next opportunity, we would reconsider the *Riviere* decision and the need for two standards. That opportunity is now before us.

■ It is significant that we address this double standard of review because a ballot title might well pass the "manifest-fraud" test utilized in art. 19, § 22, reviews, but fail the three-pronged intelligible, honest, and impartial test used in Amendment 7 ballot title cases in initiative measures. This appears to have occurred in *Riviere*. There, the three dissenters submitted that the General Assembly's referred proposed amendment concerned maximum lawful rates of interest, but its ballot title omitted material terms contained in the amendment, and they submitted those omissions were misleading and deceptive. The dissenters stated further that, while the deception did not amount to fraud, deception nonetheless existed, and that even the majority court did not deny the title before the court was misleading. As already noted, the majority court in *Riviere* simply upheld that the ballot title was sufficient because the title was not shown to constitute manifest fraud on the public.

In the present case, Thiel offers viable reasons why the General Assembly's ballot title to its proposed amendment is misleading and thwarts a fair understanding of the issues presented in the proposal. For example, while the Secretary of State argues the amendment's ballot title tells the voter that the proposal's purpose is to limit any increase in the assessed value of a taxpayer's real property as a result of a county-wide reappraisal, the title does not relate that there are taxpayers in some counties whose new assessments will not be limited because their property had not been previously appraised. In other words, the title fails to inform the public that the proposal treats taxpayers differently in 54 counties that have had prior county-wide reappraisals, from taxpayers in 21 other counties that have not had prior appraisals. In short, under Amendment No. 2, for taxpayers who live in one of the 54 counties where prior appraisals were conducted, their new assessment can be increased no more than 5 percent per year over a three-year period, at the end of which a second county-wide appraisal will commence. However, taxpayers in the 21 counties that had no prior appraisal are required

to pay their new assessment in full over the same three-year period at a rate of one-third each year.[1] In addition, a taxpayer who is disabled or sixty-five years of age or older is entitled under Amendment No. 2 to a lower assessed value, but the taxpayer only obtains immediate relief if he or she resides in one of the favored 54 counties.

Thiel emphasizes that the ballot title misleads the voters by failing to inform them that the proposed amendment mandates the General Assembly, without any mention or requirement of the vote of the people, to provide for procedures to increase ad valorem taxes and millage rates as necessary to protect bondholders on a county-wide, rather than state-wide, basis. Although this significant constitutional mandate dealing with ad valorem taxes and millage rates is covered in section 4 of the proposed amendment, the ballot title altogether omits any mention of it except a vague reference that the proposal concerns an "adjustment of property taxes."

We certainly agree with Thiel that the ballot title now before us has serious omissions by essentially and materially failing to cover sections 2 and 4 of Amendment No. 2. Under an Amendment 7 analysis, we would agree with Thiel that the referred amendment's ballot title is not free from a misleading tendency. *See Stilley v. Priest*, 341 Ark. 329, 16 S.W.3d 251 (2000). At the least, the voters and taxpayers in the 21 counties discussed above would pause or be given serious ground for reflection as to why their increase in assessments should be treated differently than ones in the other 54 counties. *Id.*; *see also Parker v. Priest*, 326 Ark. 386, 931 S.W.2d 108 (1996) (the ballot must be free from any misleading tendency, whether of amplification, or omission, or of fallacy, and it must not be tinged with partisan coloring.)

However, while we recognize the ballot title is misleading due to the significant omissions of portions of Amendment No. 2, this observation and conclusion does not decide the crucial issue before us — should we overrule *Becker v. Reviere, supra*, and this court's earlier cases that require art. 19, § 22 ballot title reviews to be evaluated under "the manifest-fraud-on-the-public" standard? Our answer, though a difficult one, is no. In reaching that decision,

---

[1] The same formula of disparate treatment pertains to non-homestead property, but the limit applied to taxpayers in the 54 counties is 10 percent of the assessed value.

we further hold that no manifest fraud has been shown and Amendment No. 2's ballot title and popular name withstands Theil's challenge and should not be struck from the November 7, 2000, General Election ballot. We now address the reasons for our continued adherence to the manifest-fraud standard.

■■ First, we consider the State's position that this court has repeatedly followed the "manifest- fraud" standard in art. 19, § 22 reviews during the past forty years.[2] *Walmsley v. McCuen,* 318 Ark. 269, 885 S.W.2d 10 (1994); *Becker,* 303 Ark. 482, 789 S.W.2d 71; *Riviere,* 277 Ark. 252, 641 S.W.2d 2; *Chaney v. Bryant,* 259 Ark. 294, 532 S.W.2d 741 (1976); *Berry v. Hall,* 232 Ark. 648, 339 S.W.2d 433 (1960). In the *Chaney* decision, the court noted the two entirely different methods by which it has reviewed referred constitutional amendments under art. 19, § 22, as compared to initiative proposals under Amendment 7. The *Chaney* court further pointed out that proposals referred by the General Assembly require no ballot title, unlike those measures that are initiated under Amendment 7. Art. 19, § 22, only requires that proposals by the General Assembly be so submitted as to enable the people to vote on each amendment separately, and this court in *Chaney* determined that the popular name, alone, served this function. *Chaney,* 259 Ark. at 297. Our court has offered the following several reasons why measures referred by the General Assembly should have a less demanding review in gaining a position on the voter's ballot:

> Legislative proposals are distinguished on the ballot from those initiated in a manner that the voters can differentiate between them. *It is notable that the constitution requires that amendments proposed by the General Assembly be published for six months before the election in a newspaper in each county, but only requires one pre-filing publication of an initiated proposal* and such other publications as may be required by law. *On the other hand, there is no permanent official record of initiated proposals. Furthermore, we must keep in mind that, when proposing a constitutional amendment, the General Assembly acts in the character and capacity of a constitutional convention* and not in the exercise of its ordinary legislative authority. (Citations omitted.) (Emphasis added.)

---

[2] While this court has recognized different standards for ballot titles for forty years, we note that the words "manifest fraud on the public" were first mentioned in *Riviere.*

Following the *Chaney* decision, the court in *Riviere* summarized the *Chaney* rationale and added another reason for utilizing a less rigorous standard when approving ballot titles on art. 19, § 22 proposals:

> Art. 19, § 22 does not specifically require a ballot title. All that is required is that the proposed amendment under art. 19, § 22 "be so submitted as to enable the electors to vote on each amendment separately." So, the purpose of the "Ballot Title" under art. 19, § 22 is not to inform the voter, but merely to distinguish and identify the amendment. *Voters can be presumed to be informed as to the contents of the amendment since art. 19, § 22 specifically requires an extended publication period of six separate monthly insertions in one newspaper in each county prior to the election.* (Emphasis added.)

Riviere, 277 Ark. at 254-255; *see also Walmsley*, 318 Ark. 269, 272, 885 S.W.2d 10, 11.

In sum, this court in prior case law has largely reviewed art. 19, § 22, proposals differently, not only because the constitutional provision itself provides for numerous publications of the General Assembly's proposed amendment, but also because of the General Assembly's notable, public action taken when it approves and refers such a measure. It is not an insignificant moment when the General Assembly exercises its constitutional convention power in referring a measure by entering it on each house's journal by the yea and nay votes.

██ While we do have the power to overrule prior decisions, it is necessary, as a matter of public policy, to uphold those decisions unless a great injury or injustice would result. *Sanders v. County of Sebastian*, 324 Ark. 433, 922 S.W.2d 334 (1996). The United States Supreme Court has recognized that adherence to precedent promotes stability, predictability, and respect for judicial authority. *Id.*; *Zinger v. Terrell*, 336 Ark. 423, 985 S.W.2d 737 (1999). In applying these controlling principles to the situation at hand, we simply are unable to say our cases using the manifest-fraud standard to review art. 19, § 22 measures should be overturned. As discussed above, there are sound reasons given to adhere to this review standard when this court considers art. 19, § 22, referred proposals. If any great injustice should possibly result, the members of the General Assembly who referred Amendment No. 2 will certainly remain accountable to the voters, as their record in refer-

ring the amendment is permanent and available to all interested persons. Such accountability is not generally available regarding measures initiated under Amendment 7.

 Thiel offers another argument as to why the lower court's decision not to remove Amendment No. 2 is erroneous. Thiel contends, as she did below, that the proposed amendment's disparate treatment of taxpayers in the 21 counties as described above is arbitrary and capricious and violates the Equal Protection Clause of the Fourteenth Amendment. We decline to address this argument, however, because this issue is not ripe for review until (or unless) the proposed measure becomes law and a case in controversy arises. *See Donovan v. Priest*, 326 Ark. 353, 931 S.W.2d 119 (1996).[3]

In conclusion, while we affirm the lower court's ruling which leaves Amendment No. 2 on the ballot, we note there is still a serious issue that looms undecided. We are unable to reach the issue at this time. Thiel appropriately points out that the General Assembly has enacted Act 1492 of 1999 (Ark. Code Ann. §§ 26-53-107(c) and 26-52-302(c)(1) (Repl. 2000)), which provides that *upon passage of proposed Amendment No. 2, the Arkansas sales and use tax will automatically increase by one-half percent.* Thiel opines this misleads electors voting for the amendment's passage. The State, on the other hand, argues that, because the text of Amendment No. 2 itself makes no mention of Act 1492, its ballot title omitting the possible increase in the sales and use tax is neither misleading nor fraudulent. Technically, the State is right. Nonetheless, the issue remains that an Arkansas voter who reads either the ballot title or text of Amendment No. 2 will never be apprised that if he or she votes for the amendment, the amendment's passage will trigger an automatic increase in the State's sales and use tax. The question also arises whether the General Assembly actually is empowered to enact a law such as Act 1492, which makes its viability contingent upon the future approval of a referred or initiated measure. For example, some question exists as to whether such laws that take effect upon future events violate the people's right of referendum under Amendment 7 provisions. The State submits that Arkansas voters

---

[3] In her reply brief, Thiel cites Act 877 of 1999 (Ark. Code Ann. §§ 7-9-501 -506 (Repl. 2000)), which provides for this court to review measures under Amendment 7, not proposals under art. 19, § 22.

likely retain their right of referendum because they are deemed on constructive notice that Act 1492 has been enacted. The State offers no citation of authority to support its argument.

 Undoubtedly, there are serious questions surrounding Amendment No. 2 and its so-called enabling legislation if the voters approve the amendment. However, resolving those issues we are able to address and decide, we agree, based on the reasons given above, that the trial court was correct in ruling the proposed amendment's ballot title is not legally deficient. We therefore affirm. The mandate is ordered issued within five days from the filing of this opinion unless a petition for rehearing is filed.

CORBIN, J., dissents.

DONALD L. CORBIN, Justice, dissenting. I agree with the majority that proposed amendments submitted by the General Assembly should be reviewed under the "manifest fraud" standard. Amendments proposed by the legislature undergo extensive deliberations among the members of both houses before they are ever submitted to the voters. Moreover, as the majority points out, the requirements for publication and dissemination of such proposed amendments are exhaustive.

I dissent, however, because I believe that a manifest fraud has been committed in this instance. In my opinion, the legislature has engaged in trickery and deceit by failing to inform the voters that upon the passage of this proposed amendment, a legislative enactment will take effect that raises the Arkansas sales and use tax by one-half percent. The trickery lies in the fact that by voting for the proposed amendment, the voter is unknowingly approving an increase in the state sales and use tax. Thus, the voter is duped into believing that by approving the amendment, he or she will receive tax relief. All the while, the voter is ignorant to the fact that any tax relief afforded by the amendment will likely be canceled out by the increase in the sales and use tax.

Surely, if the voters were aware that they were merely trading one type of tax for another, they would have serious ground to pause and reflect before approving this amendment. This is especially true for those voters who do not own any real property, as they would not receive any tax relief under the amendment, but nonetheless would be adversely affected by the increase in the sales

and use tax. Because the General Assembly has intentionally elected not to disclose this crucial information to the voters, I believe it has committed a manifest fraud upon the public, and I dissent.