The LEAGUE OF WOMEN VOTERS OF MAINE, Elizabeth H. Mitchell, and Philip E. Harriman, Plaintiffs,

v.

Dan A. GWADOSKY and Andrew Ketterer, Defendants,

and

U.S. Term Limits, Inc., On Our Terms–Campaign Committee, John M. Michael, and Belinda A. Gerry, Intervenor Defendants.

Civil No. 97–CV–1.

United States District Court,
D. Maine.

May 19, 1997.

ORDER AND MEMORANDUM
OF DECISION

BRODY, District Judge.

Plaintiffs, The League of Women Voters of Maine, Elizabeth H. Mitchell, and Phillip E. Harriman, challenge the constitutionality of the Congressional Term Limits Act of 1996 (hereinafter "the Act").[1]  21-A M.R.S.A. §§ 641–646 (Jan. 2, 1997).  Plaintiffs seek to prevent enforcement of the Act by Defendants, Dan A. Gwadosky and Andrew Ketterer (collectively referred to hereinafter as "Governmental Defendants").[2]  On January 22, 1997, the Court granted leave for U.S. Term Limits Inc., On Our Terms–Campaign Committee, John M. Michael, and Belinda A. Gerry (collectively referred to hereinafter as "Intervenor Defendants") to join this case in support of Governmental Defendants.  All parties filed motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

For the reasons set forth below, Plaintiffs' Motion for Summary Judgment is granted, and Governmental Defendants' and Intervenor Defendants' motions are denied.

### I. Background

On November 5, 1996, Maine voters passed an initiative titled "Question 1: Citizen Initiative" on the election ballot.  Question I was a referendum inquiring: "Do you want Maine to require candidates and elected officials to show support for Congressional term limits· or have their refusal printed on the ballot."  This citizen initiative was signed into law by Maine's Governor on December 3, 1996, and took effect on January 2, 1997.

After a lengthy Preamble, the Act sets forth a draft term limits amendment to the U.S. Constitution (hereinafter "proposed amendment").[3]  In substance, this proposed

David Soley, Bernstein, Shur, Sawyer & Nelson, Portland, ME, William C. Knowles, Verrill & Dana, Portland, ME, for Plaintiffs.

H. Cabanne Howard, Assistant Attorney General, Augusta, ME, for Defendants.

Samuel W. Lanham, Jr., Cuddy & Lanham, Bangor, ME, for Intervenor Defendants.

1. Elizabeth H. Mitchell is the Speaker of the Maine House of Representatives.  Philip E. Harriman is a senator in the Maine State Senate.

2. Dan A. Gwadosky is the Secretary of State for the State of Maine.  Andrew Ketterer is the Attorney General for the State of Maine.

3. The Act defines its proposed amendment as follows:

"Proposed amendment" means the following proposed amendment to the United States Constitution set forth in The Congressional Term Limit Act of 1996:

CONGRESSIONAL TERM LIMITS
AMENDMENT

Section A.  No person shall serve in the office of United States Representative for more than three terms, but upon· ratification of this amendment no person who has held the office of United States Representative or who then holds the office shall serve for more than two additional terms.

Section B.  No person shall serve in the office of United States Senator for more than two terms, but upon ratification of this amendment no person who has held the office of United States Senator or who then holds the

amendment declares that no person shall serve in the U.S. House of Representatives for more than three terms or, upon ratification of the proposed amendment, no person currently serving in the House shall serve for more than two additional terms. The same prohibition applies to U.S. senators, except that the cap on service in this house of Congress is two terms, one term for those in the Senate upon passage of the amendment. 21–A M.R.S.A. § 642.

Under the Act, Maine's U.S. congressional delegation, State legislative delegation, and Governor are "directed" to use all of their "delegated powers" to enact the proposed amendment. The Act, L.D. 1827, Secs. 2, 3, and 4 (Jan. 2, 1997). The Act further requires that the Secretary of State take all necessary steps to place the phrase "violated voter instruction on term limits" in capital letters, on the ballot, next to the name of any member of Congress, state legislator, or Governor who fails to undertake certain actions in support of the proposed amendment. For example, a member of either house of Congress representing Maine who fails to do any of the following will have "violated voter instruction on term limits" printed next to his name on the ballot in the subsequent election: 1) vote in favor of the proposed amendment when it is brought to a vote in the legislative body, committee, subcommittee, or legislative counsel; 2) second the proposed amendment, if it lacks a second in the legislative body, committee, subcommittee, or legislative counsel; 3) propose, sponsor, or otherwise bring to a vote the proposed amendment if it otherwise lacks a congressional member to do so; 4) vote in favor of all votes to bring the proposed amendment before any committee, subcommittee, or in any other setting within the legislative body in which the legislator serves; 5) reject any attempt to delay enactment of the proposed amendment, such as a move to table or re-refer to committee; 6) vote against or, in any way, support a constitutional amendment

that would increase term limits beyond those set forth in the proposed amendment; 7) vote in favor of any request for the yeas and nays on all votes on the proposed amendment; or 8) be present during voting on, or any other consideration of, the proposed amendment, unless a vote in favor of the proposed amendment can be recorded by proxy or absentee voting. 21–A M.R.S.A. § 645(1)(A)–(J).

Maine State Legislators are similarly labeled on the ballot if they fail to, among other things: 1) vote in favor of the application in any setting;[4] 2) second the application if it lacks a second in any setting; 3) propose, sponsor, or otherwise bring to a vote the application whenever necessary; 4) vote in favor of all votes to bring the application before any setting in which the legislator serves; 5) vote against any attempt to table, re-refer to committee, or in any way delay a vote in the full legislature on the application, 6) request the yeas and nays on all votes on the application if it otherwise lacks a legislator to so request; 7) vote against any amendment or modification of the application; 8) vote at any time that the application comes up for a vote either in the legislative body or committee; 9) vote against any repeal or amendment to the Act under review herein; 10) vote against any legislation that would supplement or alter the Act; 11) vote in favor of the proposed amendment if it is sent to the states for ratification; or 12) vote against any amendment to the U.S. Constitution that has longer limits than those specified in the proposed amendment. *Id.* § 643(1)(A)–(M).

The Governor of Maine also will be labeled on the ballot under the Act if he fails to: 1) veto any attempt to amend or repeal the Act or 2) veto any legislation that would supplement, alter, or affect the Act in any way. *Id.* § 644(1)(A)–(B).

office shall serve in the office for more than one additional term.
21–A M.R.S.A. § 642(2).

**4.** "Application" is defined in the Act as:
an application to the Congress of the United States to call a convention for the purpose of

proposing an amendment to the United States Constitution to limit to 3 terms the service of members of the United States House of Representatives and to 2 terms the service of members of the United States Senate.
*Id.* § 642(1).

The Act further requires that all non-incumbent candidates for federal and state office either sign a pledge to support the proposed amendment in all ways required by the Act or have the phrase "refused to pledge support for term limits" printed in capital letters next to their names on all ballots for office. *See id.* § 646.

Plaintiffs filed a Complaint alleging that the Act violates Article V (Count 1), the First Amendment (Count 2), and the Fifth Amendment (Count 3) of the U.S. Constitution. Plaintiffs request that the Governmental Defendants be enjoined from implementing the Act. Defendants claim that the Act is constitutional, and no injunction should issue. In their Motion for Summary Judgment, Plaintiffs only address the Article V and First Amendment issues. Governmental Defendants and Intervenor Defendants also address only the Article V and First Amendment issues in their cross-motions for summary judgment.

## II. Summary Judgment

Plaintiffs and Defendants filed cross motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate in the absence of a genuine issue of any material fact and when the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). Facts may be drawn from "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits." *Id.* The parties agree that no controversies regarding the material facts in this case remain. The only remaining decision is whether the Act in question is constitutional. This is a matter of law for decision by the Court.

## III. Article V

Amendment to the U.S. Constitution is allowed and restricted by Article V. Article V states that:

> [t]he Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as part of this Constitution, when ratified by the Legislatures of three fourth of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress....

U.S. Const. art. V. The Framers, although general in some areas, were specific in explaining how the Constitution can be amended. The language of Article V is plain and leaves no doubt in its interpretation. Amendments to the Constitution may be proposed either by vote of Congress or through a convention called by Congress upon application by two-thirds of the state legislatures.[5] Amendments proposed in one of these two ways become effective upon ratification by three-fourths of the state legislatures or an equal number of the state conventions.

The Framers did not make amending the Constitution an easy process. In Federalist Number 39, Madison wrote, with regard to Article V, that the Constitution is:

> neither wholly *national* nor wholly *federal.* Were it wholly national, the supreme and ultimate authority would reside in the *majority* of the people of the Union; and this authority would be competent at all times, like that of a majority of every national society, to alter or abolish its established government.

The Federalist No. 39, at 257 (James Madison) (Wesleyan University Press 1961). Madison continued that:

---

5. There is no question that the Framers had clear intentions regarding which legislative bodies had which tasks in the amendment process under Article V. "Congress" refers to Congress of the United States, and "Legislatures" refers to the representative bodies that make the laws of the people of the various states. *See, e.g., Hawke v. Smith,* 253 U.S. 221, 227–228, 40 S.Ct. 495, 497, 64 L.Ed. 871 (1920). The term "Legislatures" was not one of uncertain meaning when it was used by the Framers in Article V. This is clearly demonstrated by the distinction between senators, who, until the adoption of the Seventeenth Amendment, were elected by the legislatures of each state, and congressmen, who are elected by the people of the various states. U.S. Const. art. I, § 2, cl. 1. The difference between the people and the legislatures of the states was clear in 1787 and is not in controversy today.

[i]n requiring more than a majority ... [to amend the Constitution], and particularly, in computing the proportion by *States,* not by *citizens,* it departs from the *national,* and advances towards the *federal* character. . . .

*Id.* A direct role in the constitutional amendment process for "citizens" was not envisioned by the Framers. The citizen's function is to elect competent legislators, who in turn, when necessary, can amend the Constitution pursuant to the authority granted under Article V. Although the Framers had a clear understanding that changing times necessarily must call for a dynamic Constitution that could from time to time be altered to remain in step with the country, constitutional amendment was intended to be a deliberate and often difficult task.[6] Not only did the Framers require a super majority in Congress and of the various state legislatures, but the bodies granted the power to propose and ratify amendments were specifically designated. No exceptions were allowed. It is not within the province of the citizens of a state to propose or ratify amendments to the Constitution. It is an undisputed principle of Article V that constitutional amendment cannot be accomplished by citizen referendum. Supreme Court jurisprudence clearly supports this axiom.

In *Hawke v. Smith,* 253 U.S. 221, 40 S.Ct. 495, 64 L.Ed. 871 (1920), the Court held that a provision in the Ohio constitution allowing ratification of proposed amendments to the U.S. Constitution by citizen referendum conflicted with the amendment process set forth in Article V. The controversy in *Hawke* revolved around ratification of the Eighteenth Amendment, which enacted Prohibition in the United States. The Ohio law under review allowed ratification by a vote of the people of Ohio, rather than the Ohio legislature. In holding this method of ratification unconstitutional, the Court stated that:

[i]t is true that the power to legislate in the enactment of the laws of a State is

derived from the people of the State. But the power to ratify a proposed amendment to the Federal Constitution has its source in the Federal Constitution. The act of ratification by the State derives its authority from the Federal Constitution to which the State and its people have alike assented.

*Id.* at 230, 40 S.Ct. at 498. The Court determined in *Hawke* that Article V authorized state legislatures and state conventions to ratify amendments to the Constitution and that these ratification methods are exclusive. *Id.* at 230, 40 S.Ct. at 498 ("The choice of means of ratification was wisely withheld from conflicting action in the several States."). The Court held that the people, through the process of referendum, cannot amend the Constitution.

Shortly after *Hawke,* the Court examined the same issue in *Leser v. Garnett,* 258 U.S. 130, 42 S.Ct. 217, 66 L.Ed. 505 (1922). *Leser* was a suit brought by certain qualified voters in Maryland to strike the names of women from the register of voters on the grounds that Maryland's constitution limited suffrage to men.[7] *Id.* at 130, 135–136, 42 S.Ct. at 217, 217. The petitioners in *Leser* claimed that the U.S. Constitution had not been properly amended to include the Nineteenth Amendment because the constitutions of several of the 36 states that ratified this Amendment did not permit ratification of constitutional amendments by their legislatures. *Id.* at 136–137, 42 S.Ct. at 217–218. "The argument is that by reason of these [state constitutional] provisions the [state] legislatures were without power to ratify." *Id.* at 137, 42 S.Ct. at 217. The Court held that the power to ratify amendments to the Constitution is derived from Article V, and, therefore, no specific authorization by state constitution, or law, for ratification by the various state legislatures is necessary. Specifically, the Court stated that the:

function of a state legislature in *ratifying* a proposed amendment to the Federal Con-

---

6. Madison wrote that the Article V amendment process "guards ... against that extreme facility, which would render the Constitution too mutable. . . ." The Federalist No. 43, at 296 (James Madison) (Wesleyan University Press 1961).

7. Maryland's legislature refused to ratify the Nineteenth Amendment that granted suffrage to women. *Leser v. Garnett,* 258 U.S. 130, 136, 42 S.Ct. 217, 217, 66 L.Ed. 505 (1922).

stitution, like the function of Congress in proposing the amendment, is a federal function derived from the Federal Constitution; and it transcends any limitations sought to be imposed by the people of a State.

*Id.* at 137, 42 S.Ct. at 217–218. The Nineteenth Amendment, therefore, was held to be a valid Amendment to the Constitution. *Id.* at 136–137, 42 S.Ct. at 217–218.

*Hawke* and *Leser* would seem to indicate that the role of the people as citizens of both the various states and the United States in amending the Constitution is strictly limited to electing their state and federal officials. It appears, from these two decisions, to be within the exclusive province of the U.S. Congress and the state legislatures to deliberate and act upon potential amendments to the Constitution, unencumbered by any influences from the people who elected their lawmakers. *Leser,* in explicit terms, disallows "any limitations sought to be imposed by the people of a state." *Id.* at 137, 42 S.Ct. at 218. However, in a more recent decision, Justice Rehnquist, acting as Circuit Justice, held that a purely advisory referendum requested by the Nevada state legislature regarding the citizens' position on the proposed equal rights amendment to the Constitution survived Article V scrutiny. *Kimble v. Swackhamer,* 439 U.S. 1385, 1386–1388, 99 S.Ct. 51, 53–54, 58 L.Ed.2d 225 (Rehnquist, Circuit Justice (1978)). In essence, the Nevada legislature took a poll of its citizens to determine whether they were in favor of the equal rights amendment. The Nevada legislature, however, remained free to act on the proposed amendment in any way it felt prudent. It was free to be influenced by or completely ignore the citizens' preference on the proposed amendment. Justice Rehnquist stated that *Hawke* and *Leser:*

> stand for the proposition that the two methods for state ratification of proposed constitutional amendments set forth in Art. V of the United States Constitution are exclusive: Ratification must be by the legislatures of three-fourths of the States or by conventions in three-fourths of the States.

*Id.* at 1387, 99 S.Ct. at 54. Despite the exclusivity of the amendment methods set forth in Article V, Justice Rehnquist determined that neither *Hawke* and *Leser* nor Article V rules out communication between state legislatures and their constituents. *See id.* at 1387–1388, 99 S.Ct. at 53–54. There is, therefore, "no constitutional obstacle to a nonbinding, advisory referendum" of the sort used by the Nevada legislature in *Kimble.* *Id.* at 1388, 99 S.Ct. at 54.

The Maine Act in question is neither advisory, like the referendum examined in *Kimble,* nor does it delegate absolute authority to authorize constitutional amendments to the people of the State, which is prohibited by *Hawke* and *Leser.* Rather, it falls on the spectrum between these two extremes. In the event that Maine's elected officials violate the Act's requirements, they are sanctioned by the placement of a negative label next to their names on the ballot in the next election. The state supreme courts of California, Montana, Arkansas, and Maine have scrutinized laws that fall between permissible voter communication allowed by *Kimble,* on the one hand, and impermissible voter participation in the amendment process invalidated by *Hawke* and *Leser,* on the other.

In *AFL–CIO v. Eu,* 36 Cal.3d 687, 206 Cal.Rptr. 89, 686 P.2d 609 (1984) and *State ex rel. Harper v. Waltermire,* 213 Mont. 425, 691 P.2d 826 (1984), the supreme courts of California and Montana determined that states could not pass laws that coerce their state legislatures into applying to the U.S. Congress to call a constitutional convention. In *Eu* the proposed law would have compelled the California Legislature, on penalty of loss of salary, to apply to Congress to call a constitutional convention for the express purpose of proposing a balanced budget amendment to the Constitution. *Eu,* 206 Cal.Rptr. at 91, 686 P.2d at 611. The California court concluded that:

> the initiative, to the extent that it applies for a constitutional convention or requires the Legislature to do so, does not conform to Article V of the United States Constitution. Article V provides for applications by the "Legislatures of two-thirds of the several States," not by the people through

the initiative; it envisions legislators free to vote their best judgment, responsible to their constituents through the electoral process, not puppet legislators coerced or compelled by loss of salary or otherwise to vote in favor of a proposal they may believe unwise.

*Id.* at 93, 686 P.2d at 613. In drafting Article V, the Framers envisioned that the state legislators would be independent and autonomous when debating and voting on constitutional amendments. The fact that this independence must not be restrained by over zealous state laws was explicitly recognized in *Eu.*

In *State ex rel. Harper,* the Montana Supreme Court reviewed a proposed law similar to that struck down in *Eu.* The law would have directed the Montana Legislature to submit an application to Congress for a constitutional convention to propose a balanced budget amendment to the Constitution. The measure further provided that, if the Montana Legislature failed to make such an application within 90 days, it would have been required to remain in session, with only three days of recess, without pay. The Montana legislators would have been paid only after the application for a convention had been made to the U.S. Congress. *State ex rel. Harper,* 691 P.2d at 828. Relying on *Hawke* and *Leser,* the Montana court held that the law under review would repress the State Legislature to an extent that it would not be a "deliberative representative assemblage acting in the absence of any external restrictions or limitations." *Id.,* 691 P.2d at 830. The Montana court concluded that the:

> framers of the United States Constitution could have provided the people, through direct vote, a role in the Article V application process. They chose instead to solely vest this power within deliberative bodies, the state legislatures. The people through initiative cannot affect the deliberative process. As Initiative No. 23 places significant constraints on the Montana Legislature it is facially unconstitutional under Article V.

*Id.* at 831. Again, as with *Eu,* the independence of the Montana Legislature from undue influence by the people of the State was the main concern of the Montana court.

In *Donovan v. Priest,* 326 Ark. 353, 931 S.W.2d 119 (1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1081, 137 L.Ed.2d 216 (1997), the Arkansas Supreme Court held unconstitutional a ballot labeling law that was substantively identical to the law under review here. In *Donovan,* the Arkansas court examined proposed Amendment 9, which directed Arkansas's state and federal officials to use their powers in very specific ways in order to promote a term limits amendment to the U.S. Constitution. *Id.,* 931 S.W.2d at 123–124.[8] The Arkansas law directed the State Legislature to request that the U.S. Congress convene a constitutional convention in order to propose a term limits amendment. *Id.* All state and federal officials failing to act in conformity with Amendment 9 would have had the phrase "disregarded voter instruction on term limits" printed in capital letters next to their names on the ballot. *Id.* Candidates failing to pledge support for term limits, as defined by Amendment 9, would have been labeled on the ballot with the phrase "declined to pledge to support term limits" in capital letters. *Id.* After reviewing many of the cases discussed herein, the Arkansas court determined that Amendment 9 undermined the Article V amendment process.

> Clearly, the proposed Amendment 9 is nothing more than a coercive attempt to compel the Arkansas General Assembly to do as the alleged majority of the people wish, without any intellectual debate, deliberation, or consideration of whether such action is in the best interest of all the people of this state.

*Id.* at 127. The Arkansas court determined that Amendment 9 was unconstitutional because Article V requires that all proposals and amendments to the Constitution must come from the U.S. Congress or the state legislatures, rather than the people of the various states. *Id.* at 127–128. The Arkansas court felt that Amendment 9 was an

---

**8.** Amendment 9 was also referred to by its popular name, The Congressional Term Limits Amendment of 1996.

indirect attempt to propose an amendment to the Constitution, and, therefore, it was outside the narrow and specific grant of authority allowed under Article V.

> The proposed Amendment 9 would virtually tie the hands of the individual members of the General Assembly such that they would no longer be part of a deliberative body acting independently in exercising their individual best judgments on every issue.

*Id.* at 128. Given these findings, the Arkansas court held Amendment 9 to be in clear violation of Article V. *Id.*

In addition to these decisions by both federal and state courts, Maine's Supreme Judicial Court issued a non-binding, advisory, decision on certain questions regarding the Act. *Opinion of the Justices,* 673 A.2d 693 (Me.1996). Both federal and state constitutional questions about the Act were propounded to the Supreme Judicial Court by the Maine House of Representatives. With regard to the Article V issue, the Maine court stated that the electors of Maine cannot force either the congressional delegation or the State legislative delegation to take actions to amend the U.S. Constitution. *Id.* at 696–697. After reviewing the Act, the Supreme Judicial Court determined that:

> it is not within the power of the electors to propose a constitutional amendment. The proposed initiative, if enacted by a referendum vote, would allow the electors to do indirectly that which they are forbidden to do directly. This aspect of proposed initiative does not conform to the clearly stated procedural requirements of article V and would not appear to be constitutional.

*Id.* at 697. Although the Supreme Judicial Court clearly recognized that the people of Maine can, under *Kimble,* pass advisory referenda, it also felt that the extensive influence that the Act exercises over Maine's lawmakers violates Article V. *Id.*

Analysis of the Article V jurisprudence reveals only one case, *Donovan,* that is virtually the same as the situation before the Court here. Governmental Defendants and

Intervenor Defendants argue that *Donovan* was incorrectly decided and urge this Court to disregard its holding and analysis.

Article V is very specific in describing the process of constitutional amendment. It is left to Congress and the state legislatures to propose and ratify amendments to the Constitution. Article V, in conjunction with *Hawke, Leser,* and *Kimble,* clearly demonstrates that the citizens, at best, have a limited role in the amendment process. "Nonbinding, advisory," referenda are allowed, however, "any limitations sought to be imposed by the people of a State" are not. *Kimble v. Swackhamer,* 439 U.S. 1385, 1388, 99 S.Ct. 51, 54, 58 L.Ed.2d 225 (Rehnquist, Circuit Justice (1978)), *Leser v. Garnett,* 258 U.S. 130, 137, 42 S.Ct. 217, 217–218, 66 L.Ed. 505 (1922).

The federal and state case law clearly reflect that Article V does not permit the people of a state to coerce their elected officers into acting in a specific way regarding proposal and ratification of amendments to the Constitution. A citizen's role is outside the Article V process. The citizen votes to elect the state's federal and state lawmakers. These elected officials, in turn, through a deliberative and independent process, propose and ratify constitutional amendments when this becomes necessary. Maine's Act, therefore, is legally incorrect in stating in its Preamble that "[t]he people, not Congress, should set Term Limits." 21–A M.R.S.A. §§ 641–646, Preamble.

The question, therefore, is whether the Act impermissibly coerces Maine's state and federal officials to conform to its dictates. Plaintiffs claim that the labels placed next to a candidate's name on the ballot, if the candidate does not act within the narrow confines dictated by the Act, unconstitutionally infringe on the deliberative process of constitutional amendment mandated by Article V. The ballot labels drafted by the State are certainly not neutral. They do not simply state that the candidate is "for term limits" or "against term limits." [9] Rather, they de-

---

**9.** The Court is obviously not ruling on the constitutionality of neutral ballot labels, such as "for term limits" and "against term limits." Such a

determination will have to wait for another day, assuming the presentation of a focused controversy on this issue. The Court notes, however,

clare that candidates "violated voter instruction on term limits" or "refused to pledge to support term limits." They are brands of disapproval by the State and are only placed next to the names of candidates who do not perform in accordance with the Act. The names of candidates who conform to the Act's dictates are placed on the ballot unadorned. To disseminate such negative labels next to a candidate's name at a time when the voter is most susceptible to persuasion, *i.e.*, while in the ballot box, would certainly influence Maine's elected officials when they are deliberating and voting on the term limits issue. To hold otherwise would be to ignore the plain language of the ballot labels. If a voter in the ballot box, as he is casting his vote, sees that a candidate has "violated" or "refused" the voters' wishes, that candidate is severely handicapped in his election bid. This fact works to coerce Maine's lawmakers to follow the dictates of the Act irrespective of the merits, or lack thereof, of the proposed term limits amendment. Article V's required deliberative and independent process is lost.[10]

The fact that the Act coerces elected officials to undertake certain activities regarding a term limits amendment does not mean that all candidates are forced to do as the Act requires. Candidates may still choose to act contrary to the Act's requirements, but such a choice is clearly made at their significant political risk. This Court agrees with the *Eu, State ex rel. Harper, Donovan*, and Maine Supreme Judicial Court determinations that a law does not have to eliminate all possibility of independent action by the elected officials for it to violate Article V. In other words, a law does not have to be unequivocally binding to be unconstitutional. To hold otherwise would elevate form over substance. Under the laws overturned in *Eu* and *State ex rel. Harper*, the state legislators could still decide not to request a constitutional conven-

tion as the laws urged. However, such lawmakers would not be paid and, under Montana's law, the State Legislature would have to stay in session. Despite these sanctions, the decision of whether to request a convention ostensibly remained in the hands of the legislatures. A law does not have to reduce the role of the state legislature to that of simply a puppet tribunal enacting the will of the people for it to violate Article V.

The coercive impact of Maine's Act and the *Donovan* law is similar to that of the California and Montana laws. Maine legislators could violate the law but to do so would assure almost certain repercussions in the next election. That, in fact, is the ultimate objective of the Act. This untenable sanction eliminates the ability of Maine's elected officials to act in a deliberative and independent manner as was envisioned by the Framers when they drafted Article V.

Intervenor Defendants claim that the Act is not coercive but rather provides non-binding instructions from Maine's voters to their legislators. *See* Intervenor Defendants' Motion for Summary Judgment at 16–17 (Mar. 24, 1997) (wherein Intervenor Defendants claim that the Act's ballot labels "provide voters with objective information" on candidates' positions); Intervenor Defendants' Reply to Motion for Summary Judgment at 1–4 (Apr. 15, 1997). This argument raises naivete to new heights. To hold that the Act's labels are objective or that the threat of coercive labels placed next to a candidate's name on the ballot would not affect the candidate's judgment is to ignore reason. The labels, as drafted in the Act, are not merely informational as claimed by Defendants. They are explicitly, and this Court believes effectively, targeted to persuade voters that all candidates so labeled are unworthy of public office. They are intentionally intimidating.

that unrestricted position statements placed on the ballot, even if they are neutrally drafted, regarding issues ranging from abortion to tax policy would radically change the voting process as it is currently implemented at the state and federal level.

10. Intervenor Defendants claim that "Maine is not endorsing the particular viewpoint that can-

didates with the required language next to their names are poor candidates...." Defendant Intervenors' Motion for Summary Judgment at 6 (Mar. 24, 1997). This argument ignores the language and effect of the Act. The clear implication is that only the undesirable candidates are labeled as having "violated" or "refused" voter instructions.

Intervenor Defendants further claim that the non-binding nature of the Act is supported by the fact that Representative Tom Allen of Maine's First Congressional District violated the Act by voting against term limits in the U.S. House of Representatives. *See* 143 Cong. Rec. H491–H512 (daily ed. Feb. 12, 1997) (recorded votes and debate on proposed term limits amendments). Intervenor Defendants argue that, if the Act were in fact coercive, Representative Allen, and other representatives from states that recently passed laws similar to Maine's Act, would have been forced to vote for the term limits amendments proposed in Congress this past February 1997. They claim that he acted in an independent and deliberative manner, and this is clear proof that the Act does not violate the dictates of Article V. In addition to Representative Allen's voting record, Intervenor Defendants point out that, during the February 1997 U.S. House of Representatives' debate on the term limits amendment, Representative Bereuter of Nebraska stated on the House floor that he:

> simply cannot in good conscience support such a 6–year term limit, as it is clearly contrary to the national interest. I might have a scarlet letter next to my name on the ballot next year. So be it. I am not going to vote against the national interest. I have never knowingly done it, and am not going to start at this time. Despite such political threats as the proposed notation on the ballot, this Member will not do

something that is damaging to the national interest.

*Id.* at H478 (statement by Rep. Bereuter). Representative Bereuter's State, Nebraska, enacted a ballot labeling law similar to Maine's last November. Intervenor Defendants argue that the votes of representatives like Bereuter and Allen support Intervenor Defendants' contention that the Act is not coercive. The Court views Representative Bereuter's remarks in a different way. They demonstrate the extensive, and impermissible, role that laws like the Act played in the House deliberations on the proposed term limits amendments. If representatives who are against the currently proposed version of the term limits amendment are forced to make the clearly agonizing decision of whether to vote against the amendment, thus dealing a devastating blow to their reelection chances, or voting for the amendment despite their convictions to the contrary, the deliberative and independent Article V process is lost.[11] The Act would have such an undue influence on Maine's lawmakers that it is unconstitutional.[12]

Defendants further claim that the Act falls within the State's authority to regulate its elections. *See Burdick v. Takushi,* 504 U.S. 428, 433, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992); *Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 220, 107 S.Ct. 544, 551–552, 93 L.Ed.2d 514 (1986); *Anderson v. Celebrezze,* 460 U.S. 780, 788, 103 S.Ct. 1564,

---

**11.** As previously stated, given the wording of the Act's ballot labeling laws, the Court finds the recent votes cast by congressmen such as Allen and Bereuter of limited use. In addition to the rationale discussed above, the Court is convinced that the full effects of the Act have not as yet been felt. Laws like Maine's Act were just recently enacted when the February 1997 term limits amendment vote in the U.S. House of Representatives was taken. Although elected officials presumably knew about the sanctions imposed under the Act, the full coercive effect of the Act's ballot labeling provisions would only be felt after legislators labeled on the ballot as violating or refusing voter instructions began to lose elections. Once the ramifications of the ballot commentary required by the Act were observed by elected officials, the coercive effect of the labeling provisions would be even greater.

As noted above, the fact that ballot labeling laws such as Maine's Act are permeating the

debate on a constitutional amendment, as demonstrated by Representative Bereuter's speech on the House floor, only serves to highlight the coercive and unconstitutional effect of such laws.

**12.** Governmental Defendants argue that the Act is "not coercive in the least" and rather simply seeks to "bring to the voters' attention accurate information" regarding the candidates' positions on term limits. Governmental Defendants' Motion for Summary Judgment at 9 (Mar. 24, 1997). The Court finds Governmental Defendants' argument disingenuous. As noted above, commentary on the ballot using words such as "violated" and "refused" is clearly not passive or informational. Rather it is active and instructive. Voters are not simply told what all candidates' positions are. They are told, only for specific candidates, that they "violated" or "refused" to follow the voters' directive. Ballot labeling that is drafted in this way is coercive, not informational.

1569–1570, 75 L.Ed.2d 547 (1983). States have the authority to regulate the time, place, and manner of their elections. U.S. Const. art. I, § 4, cl. 1. Pursuant to this authority, ballot labels providing voters with information regarding party affiliation, residence, office sought, which candidates are incumbents, and candidates' nicknames are frequently used. The Supreme Court has only once invalidated ballot information. In that case, a Louisiana statute requiring that ballots designate the race of candidates was struck down because it violated the Equal Protection Clause of the Fourteenth Amendment. *Anderson v. Martin,* 375 U.S. 399, 401–402, 84 S.Ct. 454, 455–456, 11 L.Ed.2d 430 (1964). Obviously Maine's ballot labeling law is in no way analogous to the Louisiana law struck down in *Anderson.* However, although states clearly have the authority to regulate their elections, Defendants' argument fails to address the Article V issue. Placing information on the ballot such as a candidate's party affiliation and the office for which the candidate is running has no, or at best minimal, impact on the Article V amendment process. Intervenor Defendants claim that the labels placed on the ballot under the Act are no more coercive than party labels or incumbency designations that are commonly allowed. Intervenor Defendants' Motion for Summary Judgment at 19 (Mar. 24, 1997). Obviously all ballot labels have some impact on voters' decisions However, the question here is whether the labels, as drafted, impermissibly coerce Maine's legislators to an extent that the deliberative process set forth in Article V is subverted. The ballot labels claimed by Defendants to be analogous, such as party affiliation, are far more general than the Act's labels and are not targeted to have the Act's intended impact on voter choice. It is the Act's impermissible influence on the amendment process that creates the constitutional concern, not the fact that information is provided on the ballot.

There was one occasion when candidates for legislative office were labeled on the ballot with specific information, other than the generally allotted labels, such as party affiliation, discussed above.[13] Article I of the Constitution initially provided for election of U.S. senators by the legislatures of the states.[14] Despite this requirement, many states put statements on the ballot for election of state legislators designating whether each candidate would either 1) vote for the voters' choice for senator or 2) vote for the senator of his own choosing, thus considering the people's vote as simply a recommendation. In essence, the people of these states were attempting to thwart the process of electing U.S. senators mandated by the Constitution. The ballot labeling laws were an attempt to coerce the state legislators into voting for the people's choice for senator.

Intervenor Defendants claim that Maine's Act is patterned after the ballot language used by the states that labeled their state legislative candidates' voting predilections regarding election of senators. Intervenor Defendants' Motion for Summary Judgment at 25 (Mar. 24, 1997). Although there are clear similarities between the pre-Seventeenth Amendment ballot labeling laws and Maine's Act, this fact is of limited use to the Court. These Senate voting laws all existed prior to the cases guiding the Court's determination here, and no federal court ever held these ballot labeling laws constitutional under Article V review. The Court here declines to undertake the clearly unnecessary task of

---

**13.** In addition to cases reviewing ballot labeling of legislative candidates, Intervenor Defendants offer allegedly analogous situations where "delegates" or "electors" to conventions have been required to pledge support for or against certain positions or candidates. *See, e.g., Ray v. Blair,* 343 U.S. 214, 72 S.Ct. 654, 96 L.Ed. 894 (1952) (upholding a requirement that a political party's candidates for presidential electors pledge to support the party's nominees for President and Vice President at the party's national convention). These cases are not analogous to the situation before the Court here for two reasons. First, frequently they are not related to the Article V amendment process. Second, the function of a delegate or elector is focused and limited, no part of which is provided for in the Article V process.

The Court finds labeling, and pledge requirements, for delegates and electors to be substantially different from the situation presented in this case.

**14.** Ratification of the Seventeenth Amendment in 1913 assured that each state's senators shall be "elected by the people thereof...." U.S. Const. amend. XVII, cl.1.

deciding whether the ballot labeling laws from the early part of this century were constitutional.[15] Given the unsettled nature of the law in this area, these pre-Seventeenth Amendment ballot labeling laws offer little support for Defendants' argument.

## IV. Conclusion

This Court is aware of the Supreme Court's concern, recently expressed in *Arizonans for Official English v. Arizona*, — U.S. ——, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997), that federal courts should be hesitant in overturning state statutes. *Id.* at —— ——, 117 S.Ct. at 1072–1073. Only after carefully deciding whether the conflict must necessarily be decided should a state law's constitutionality be resolved by a federal court. If a state law can be interpreted, or implemented, in a constitutional way, federal court review should await state court determination of the controlling interpretation of the law's meaning. *See, e.g., id.* at ——, 117 S.Ct. at 1073; *Rescue Army v. Municipal Court of Los Angeles*, 331 U.S. 549, 568–574, 67 S.Ct. 1409, 1419–1423, 91 L.Ed. 1666 (1947). This case, however, presents the type of focused controversy where an unconstitutional state law must be enjoined. There is no debate regarding how the Act will be implemented by the State. The Act effectively coerces Maine's elected officials through its ballot labeling provisions. Given this coercion, the State's legislators cannot act in the deliberative and independent manner required by Article V of the Constitution. The Act is, therefore, unconstitutional, and the Court finds that all requirements for an injunction exist. Given the Court's finding on Count I of the Complaint, examination of the other alleged unconstitutional aspects of the Act is unnecessary.

Plaintiffs' Motion for Summary Judgment is GRANTED. Governmental Defendants' and Intervenor Defendants' motions are DENIED. Governmental Defendants are en-

joined from implementing and enforcing any portion of the Act.

No fees or costs are awarded.

*SO ORDERED.*

---

**15.** It is noteworthy that Justice Day wrote in *Hawke*, which was decided about five years after the 1913 adoption of the Seventeenth Amendment, that:

> [i]t was never suggested, so far as we are aware, that the purpose of making the office of Senator elective by the people could be accomplished by a referendum vote. The necessity of the amendment to accomplish the purpose of popular election is shown in the adoption of the amendment.

*Hawke v. Smith*, 253 U.S. 221, 228, 40 S.Ct. 495, 497, 64 L.Ed. 871 (1920).