Karen A. MORRISSEY, Petitioner,

v.

The STATE of Colorado, Respondent,

and

U.S. Term Limits, Inc., and Dennis Polhill, Respondents–Intervenors.

Richard R. GOGGIN, individually and as a duly elected and appointed Election Judge for the City and County of Denver, Colorado; Walter Cross, individually and as a previous and future candidate for the Colorado State General Assembly; Charles R. Duke, individually and as a sitting Colorado State Senator; and on behalf of all others similarly situated, Petitioners,

v.

The STATE of Colorado; Roy Romer, as Governor of the State of Colorado; Victoria Buckley, as Secretary of State of the State of Colorado; Gale Norton, as Attorney General of the State of Colorado; The Title Board of the State of Colorado; Victoria Buckley, Gale Norton, and Rebecca Lennahan, as members of said Title Board; and the General Assembly of the State of Colorado, Respondents,

and

U.S. Term Limits, Inc., and Dennis Polhill, Respondents–Intervenors.

Nos. 97SA3, 97SA5.

Supreme Court of Colorado, En Banc.

Jan. 20, 1998.

---

Andrew B. Reid, Denver, for Petitioner.

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, Hugo Teufel III, Deputy Solicitor General, Paul Farley, Deputy Attorney General, Maurice G. Knaizer, Deputy Attorney General, State Services Section, Denver, for Respondents.

Paul Grant, Parker, for Respondents–Intervenors.

Isaacson, Rosenbaum, Woods & Levy, P.C., Edward T. Ramey, American Civil Liberties Union of Colorado, Mark Silverstein, Jane Anne Bell, Denver, for Amicus Curiae American Civil Liberties Union of Colorado.

John V. Fried, Denver, Pro Se.

Citizens Against Constitution Tampering, John V. Fried, Chairman, Denver, As Amici Curiae John V. Fried and Citizens Against Constitution Tampering.

Jayne Schindler, Brighton, Pro Se, As Amicus Curiae Jayne Schindler.

Richard Goggin, Denver, Pro Se.

Walter Cross, Aurora, Pro Se.

Charles R. Duke, Monument, Pro Se.

Chief Justice VOLLACK delivered the Opinion of the Court.

In this original proceeding, two separate petitioners, Karen Morrissey (97SA3) and Richard Goggin, Walter Cross and Charles R. Duke (97SA5), challenge the constitutionality of Article XVIII, Section 12 (Amendment 12), a voter initiated amendment to the Colorado Constitution.[1] Pursuant to orders

---

1. Section 6 of Amendment 12 provides the basis for our original jurisdiction in this case. That

section provides that "any legal challenge to this

of this court issued on January 28, 1997, and March 31, 1997, these cases were consolidated and nine separate issues were set for briefing and oral argument.[2] We now hold that Amendment 12 is unconstitutional.

### I.

In *United States Term Limits v. Thornton*, 514 U.S. 779, 838, 115 S.Ct. 1842, 1871, 131 L.Ed.2d 881 (1995), the United States Supreme Court affirmed a judgment of the Arkansas Supreme Court which held that a voter initiated amendment to the Arkansas Constitution setting term limits for Arkansas' congressional representatives was unconstitutional. In holding that the states could not set term limits for their congressional representatives, the *Thornton* Court explained:

> We are ... firmly convinced that allowing the several States to adopt term limits for congressional service would effect a fundamental change in the constitutional framework. *Any such change must come not by legislation adopted either by Congress or by an individual State, but rather—as have other important changes in the electoral process—through the Amendment procedures set forth in Article V. ...* In the absence of a properly passed constitutional amendment, allowing individual States to craft their own qualifications for Congress would ... erode the structure envisioned by the Framers, a structure that was designed, in the words of the Preamble to our Constitution, to form a "more perfect Union."

*Id.* at 837–38, 115 S.Ct. at 1871 (emphasis added). Once *Thornton* foreclosed the states from directly limiting the number of terms served by congressional representatives, term limits advocates heeded the advice of the Supreme Court and focused their efforts on amending the United States Constitution. It is within this context that the people of the State of Colorado were presented with Amendment 12.

Amendment 12 was enacted by the people on November 5, 1996, and became effective upon proclamation of the Governor on December 26, 1996.[3] Amendment 12 sets forth the "exact language" of a proposed "Term Limits Amendment" to the United States Constitution and directs Colorado's state legislators to apply for a constitutional convention and ratify the Amendment when it is referred to the states. Similarly, Amendment 12 directs Colorado's congressional representatives to approve the Term Limits Amendment. In order to ensure compliance, the words "DISREGARDED VOTER INSTRUCTION ON TERM LIMITS" are required to appear on all primary and general election ballots beside the name of any incumbent candidate who fails to comply with Amendment 12's directives.

Amendment 12 also instructs non-incumbent candidates for state or congressional office to sign a pledge promising to use all their legislative powers to enact the Term Limits Amendment and, if elected, to vote in such a way that the ballot designation will not appear next to their name in future elections. A similar designation, with the words "DECLINED TO TAKE PLEDGE TO SUPPORT TERM LIMITS," is required to appear on election ballots next to the name of any non-incumbent candidate who refuses to sign the pledge.

Section 5(b) of Amendment 12 provides the specific circumstances upon which a ballot designation is justified. Some of these circumstances include: (1) failing to vote for the Term Limits Amendment; (2) failing to second a motion for a vote on the Term Limits Amendment; (3) failing to vote against any attempt to delay or table a vote on the Term Limits Amendment; (4) failing to vote against a change, addition, or modification of the Term Limits Amendment; and (5) failing to vote against any amendment with longer limits than those set forth in the Term Limits Amendment. Section 5(a) of Amendment 12 vests the secretary of state with the power to determine whether a ballot designation is warranted in a particular case. This section also provides that ballot designations

---

[Amendment] 12 shall be an original action filed with the Colorado supreme court."

**2.** These nine issues are set forth in Appendix A.

**3.** Amendment 12 is set forth in its entirety in Appendix B.

"shall appear unless clear and convincing evidence establishes that the candidate has honored voter instructions or signed the pledge." Finally, section 6 provides that all of Amendment 12's terms are severable.

## II.

### A.

Article V of the United States Constitution provides in pertinent part:

> The congress, whenever two thirds of both houses shall deem it necessary, shall propose amendments to this constitution, or, on the application of the legislatures of two thirds of the several states, shall call a convention for proposing amendments, which, in either case, shall be valid to all intents and purposes, as part of this consti-tution, when ratified by the legislatures of three fourths of the several states, or by conventions in three fourths thereof, as the one or the other mode of ratification may be proposed by the congress.

(Emphasis added.) The plain language of Article V provides two methods for proposing an amendment to the United States Constitution. Either Congress can propose an amendment by two-thirds vote of both houses, or two-thirds of the state legislatures can apply to Congress to call a constitutional convention for the purpose of proposing amendments. The question posed by the present case is whether Amendment 12 represents an impermissible attempt to interfere with this procedure.

In *Hawke v. Smith*, 253 U.S. 221, 231, 40 S.Ct. 495, 498, 64 L.Ed. 871 (1920), the United States Supreme Court struck down an amendment to the Ohio Constitution which left the state legislature's ratification power subject to referendum by the people. In support of its holding, the *Hawke* Court explained that

> [t]here can be no question that the framers of the Constitution clearly understood and

carefully used the terms in which that instrument referred to the action of the Legislatures of the states. *When they intended that direct action by the people should be had they were no less accurate in the use of apt phraseology to carry out such purpose.*

*Id.* at 228, 40 S.Ct. at 497 (emphasis added); *see also Prior v. Noland*, 68 Colo. 263, 270, 188 P. 729, 731 (1920) (explaining that "the people have no power to ratify a proposed amendment to the federal Constitution"). Two years later, the Supreme Court revisited the citizens' role in the Article V ratification process in *Leser v. Garnett*, 258 U.S. 130, 42 S.Ct. 217, 66 L.Ed. 505 (1922), and concluded that

> the function of a state Legislature in ratifying a proposed amendment to the federal Constitution, like the function of Congress in proposing the amendment, is a federal function derived from the federal Constitution; and *it transcends any limitations sought to be imposed by the people of a state.*

*Id.* at 137, 42 S.Ct. at 217–18 (emphasis added).[4]

Despite the Supreme Court's admonitions against citizen involvement in the Article V process, citizen participation that is merely advisory and nonbinding has survived Article V scrutiny. *Kimble v. Swackhamer*, 94 Nev. 600, 584 P.2d 161 (1978), concerned an advisory question presented to voters by the Nevada legislature requesting voter recommendations on ratification of the equal rights amendment. The advisory question was challenged on Article V grounds. The Nevada Supreme Court held that presenting the advisory question to voters would not intrude upon the state legislature's Article V powers because the advisory question "does not concern a binding referendum, nor does it impose a limitation upon the legislature." *See id.*, 584 P.2d at 162; *see also Kimble v. Swackhamer*, 439 U.S. 1385, 1388, 99 S.Ct.

---

4. While these cases are somewhat distinguishable from the present case because they concern ratification, the ratification and proposal powers set forth in Article V are closely connected and emanate from the same constitutional source. *See Dillon v. Gloss*, 256 U.S. 368, 374–75, 41

S.Ct. 510, 512, 65 L.Ed. 994 (1921) (explaining that the Article V proposal and ratification processes are not unrelated acts, but are "succeeding steps in a single endeavor"). Therefore, the reasoning of these cases applies with equal force in either a proposal or ratification context.

51, 54, 58 L.Ed.2d 225 (Rehnquist, Circuit Justice 1978).[5]

Contrary to the nonbinding and advisory question presented to voters in *Kimble*, other courts have determined that citizens' initiatives designed to coerce elected officials into exercising their Article V powers are unconstitutional. In this regard, the supreme courts of California and Montana have held that initiatives which threaten to withhold compensation and/or prolong legislative sessions until lawmakers pass legislation calling for a constitutional convention violate Article V. *See American Fed'n of Labor–Congress of Indus. Org. v. March Fong Eu*, 36 Cal.3d 687, 206 Cal.Rptr. 89, 102, 686 P.2d 609, 622 (1984); *State ex rel. Harper v. Waltermire*, 213 Mont. 425, 691 P.2d 826, 831 (1984). In *Eu*, the California Supreme Court explained that

Article V provides for applications by the "Legislatures of two-thirds of the several States," not by the people through the initiative; it envisions legislators free to vote their best judgment, responsible to their constituents through the electoral process, not puppet legislators coerced or compelled by loss of salary or otherwise to vote in favor of a proposal they may believe unwise.

*Eu*, 206 Cal.Rptr. 89, 686 P.2d at 613. Similarly, the Montana Supreme Court explained in *Harper* that

[t]he framers of the United States Constitution could have provided the people, through direct vote, a role in the Article V application process. They chose instead to solely vest this power within deliberative bodies, the state legislatures. The people

through initiative cannot affect the deliberative process.

*Harper*, 691 P.2d at 831.

More recently, several courts have considered whether term limits initiatives similar to Amendment 12 violate Article V. *See League of Women Voters of Maine v. Gwadosky*, 966 F.Supp. 52 (D.Me.1997); *Donovan v. Priest*, 326 Ark. 353, 931 S.W.2d 119 (1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1081, 137 L.Ed.2d 216 (1997); *Opinion of the Justices*, 673 A.2d 693 (Me.1996); *In re Initiative Petition No. 364*, 930 P.2d 186 (Okla.1996). In each of these cases, the court concluded that the term limits initiative violated Article V because it called for negative ballot designations designed to coerce legislators into invoking their Article V powers. *See Gwadosky*, 966 F.Supp. at 63; *Donovan*, 931 S.W.2d at 128; *Opinion of the Justices*, 673 A.2d at 697; *In re Initiative Petition No. 364*, 930 P.2d at 193.[6]

 As the foregoing authorities make clear, Article V precludes state citizens from having any substantial role in amending the federal Constitution for that power rests exclusively with Congress and the state legislatures and "transcends any limitations sought to be imposed by the people of a state." *See Leser*, 258 U.S. at 137, 42 S.Ct. at 217–18. While the *Kimble* cases suggest that some form of advisory or nonbinding citizen participation in the Article V process is permissible, we agree with the great majority of cases which prohibit citizens from directing or coercing their elected representatives into exercising their Article V powers. The implicit assumption woven through the decisions of other courts that have struck down

5. Following the Nevada Supreme Court's decision in *Kimble*, then-Justice Rehnquist, acting as Circuit Justice, denied an application to enjoin placement of the advisory question on the Nevada ballot pending review by the United States Supreme Court. *See Kimble*, 439 U.S. at 1388, 99 S.Ct. at 54. In reaching this conclusion, Justice Rehnquist explained that

I would be most disinclined to read either *Hawke* ... or *Leser* ... or Article V as ruling out communication between the members of the legislature and their constituents. If each member of the Nevada Legislature is free to obtain the views of constituents in the legislative district which he represents, I can see no

constitutional obstacle to a nonbinding, advisory referendum of this sort.

*Id.* at 1387–88, 99 S.Ct. at 54.

6. Recently, the Idaho Supreme Court struck down portions of an initiative similar to Amendment 12 on grounds that it violated the Speech and Debate Clauses of the United States and Idaho Constitutions as well as a non-incumbent candidate's right to free speech. *See Simpson v. Cenarrusa*, 130 Idaho 609, 944 P.2d 1372, 1374–76 (1997). Although we believe that Amendment 12 implicates constitutional provisions other than Article V, we decline to base our holding on these authorities.

term limits provisions similar to Amendment 12 is that these provisions undermine representative government. Such intrusions into the legislative realm circumvent the strict requirements of Article V and disturb the balance of our representative system. With these principles in mind, we now consider the constitutionality of Amendment 12.

## B.

■ Amendment 12 is an initiative passed by the citizens of Colorado directing our state and congressional representatives to propose and ratify a specified amendment to the United States Constitution. Contrary to the advisory question presented by the state legislature in *Kimble*, Amendment 12 instructs lawmakers to proceed on a precise and inflexible course of action utilizing the full range of their Article V authority. The citizens' use of the initiative process to demand passage of a constitutional amendment clearly violates the strict language of Article V, which precludes state citizens from direct participation in the amendment process.

Similarly, citizens may not use ballot designations to coerce their elected officials into amending the federal Constitution. We disagree with the Respondents' claim that Amendment 12's ballot designations are merely informational and resemble other permissible designations such as the candidate's party affiliation. Contrary to such passive and informational designations, Amendment 12's ballot designations are negative and instructional, apprising voters of particular candidates who have disregarded or declined to follow the people's will and are therefore unworthy of holding public office. The usual and expected consequence of these state sanctioned labels, which incite voters at precisely the moment when they are most susceptible to persuasion, is more votes cast in favor of other, more cooperative, candidates. *See Gwadosky*, 966 F.Supp. at 60; *Donovan*, 931 S.W.2d at 128. Besides the obvious impact such designations have on the vote tally, candidates are also barred from having any real opportunity to respond to ballot designations, despite the fact that the designation may be seriously misleading in some situations.[7] Without any effective means to combat these ballot designations, lawmakers are essentially forced to choose between wholesale adherence to Amendment 12's instructions and political death. *See Donovan*, 931 S.W.2d at 127–28.[8]

## C.

Amendment 12 usurps the exercise of representative legislative power by dictating to elected representatives the precise manner in which they are to attempt to amend the United States Constitution. Amendment 12 does not itself accomplish that amendment; rather, it violates Article V by coercing legislators to amend the United States Constitution. This coercion of legislators is itself inconsistent with Article IV, Section 4 (the Guarantee Clause), which guarantees to every state a republican form of government.[9]

■ The framework of our republican form of government is created by the Guarantee Clause of Article IV, Section 4. It is the Guarantee Clause that assures the role of elected representatives in our system. A republican form of government is one in which the "supreme power rests in all the citizens entitled to vote and is exercised by

7. For example, a legislator in favor of congressional term limits may question the wisdom of calling a constitutional convention where a multitude of constitutional amendments, wholly unrelated to term limits, could also be proposed. Despite the fact that the legislator favors term limits, the legislator would nevertheless receive a ballot designation denoting otherwise if he seeks to amend or oppose the Term Limits Amendment.

8. Contrary to the Respondents' assertions, the fact that some dissenting legislators may summon the courage to refuse to follow Amendment 12's directives is irrelevant. Rather, the ballot designation provisions of Amendment 12 are repugnant because they seek to coerce politically vulnerable legislators, who would ordinarily oppose invocation of their Article V power, into abandoning their convictions and following Amendment 12's mandate.

9. The power to amend the United States Constitution is afforded directly to legislators under the terms of Article V. We refer to Article IV, Section 4, to explain the importance of the legislative role in our system of government. Because we rest our opinion on a violation of Article V, we do not reach the question of whether Article IV, Section 4, is justiciable.

representatives elected, directly or indirectly, by them and responsible to them." *Webster's New World Dictionary* 1207 (2d College ed.1986). The power delegated to elected representatives is the hallmark of a republic.

Amendment 12 abrogates that representative form of government because it takes away from elected officials the right to exercise their own judgment and vote the best interests of their constituencies as they perceive them. Our system of election contemplates free and full discourse concerning a candidate's positions on a variety of issues before an election. The electorate explores not only the ideological bent of a particular candidate, but also the candidate's integrity, honesty and record. Voters choose the people whom they believe will best represent their own beliefs, preferences, and interests. At the next election, citizens speak their approval or disapproval of a legislator's record with their votes.

Ours is not a system of government that requires an elected representative to proceed in any particular or foreordained manner on any issue. Voters have expectations about how individual representatives will vote, formed on the basis of political affiliation, campaign promises, or prior performance. However, the representative is answerable first to his or her own conscience, then to constituents who may at any time express individual concerns or wishes and, in the end, to the electorate upon the occasion of re-election.

Amendment 12 ties the hands of the individuals who are chosen to represent this state. The process of instructing legislators how to proceed, and then directing the state to label them on the basis of compliance or non-compliance with that directive is not advisory. The language of the Amendment as it relates to the course of conduct of the representatives is not precatory either; it is mandatory. The voters are dictating to elected officials a precise course of action, thereby controlling the hand and voice of those officials.

Amendment 12 carves a wholly new and unacceptable method of decision-making into our representative system by taking away our elected officials' right to exercise their own judgment and vote in the best interests of their constituencies as they perceive them. By attempting to control our state and congressional representatives, Amendment 12 imposes a majoritarian will on lawmakers and effectively silences minority viewpoints. Amendment 12 therefore seeks to deprive our elected representatives of their legislative discretion. In our system, the people set policy by choice, not control, of their elected representatives.

### III.

Our holding should not be read as a condemnation of the congressional term limits. Instead, we conclude that the manner in which Amendment 12 seeks to accomplish that objective violates Article V of the United States Constitution because it attempts to usurp our elected representatives' exclusive authority to amend the United States Constitution using explicit mandates and coercion. By completely taking away our elected representatives' discretion in fulfilling this constitutional duty, Amendment 12 runs contrary to the principle of representative government. For these reasons, we hold that Amendment 12 is unconstitutional. Having reached this conclusion, we find it unnecessary to address the other challenges to the constitutionality of Amendment 12.

### APPENDIX A

1. Whether this court has jurisdiction and, if so, whether petitioners' claims are barred as res judicata.

2. Whether Amendment 12 is inconsistent with and was proposed in violation of the single-subject requirement of Colo. Const. art. V, § 1(5.5).

3. Whether Amendment 12 establishes qualifications for Colorado's representatives and senators inconsistent with and in violation of U.S. Const. art. I, §§ 2, 3.

4. Whether Amendment 12 violates U.S. Const. art. I, § 4, regarding the regulation of elections, including the times, places, and manner of holding elections for senators and representatives.

918

5. Whether Amendment 12 is inconsistent with and violates the speech and debate clause of U.S. Const. art. I, § 6.

6. Whether Amendment 12 is inconsistent with and violates U.S. Const. art. I, § 8.

7. Whether Amendment 12 is inconsistent with and violates the guarantee of a republican form of government provided by U.S. Const. art. IV, § 4.

8. Whether Article XVIII, § 12, of the Colorado Constitution (Amendment 12) is inconsistent with and violates U.S. Const. art. V regarding the process by which amendments to the U.S. Constitution may be proposed.

9. Whether Amendment 12 is inconsistent with and violates the rights of freedom of speech and association provided for under the U.S. Const. amends. I and XIV.

*APPENDIX B*

Section 12. (1) CONGRESSIONAL TERM LIMITS AMENDMENT. The exact language for addition to the United States Constitution follows:

Section 1: No person shall serve in the office of United States Representative for more than three terms, but upon ratification of this amendment no person who has held the office of United States Representative or who then holds the office shall serve for more than two additional terms.

Section 2: No person shall serve in the office of United States Senator for more than two terms, but upon ratification of this amendment no person who has held the office of United States Senator or who then holds the office shall serve more than one additional term.

Section 3: This amendment shall have no time limit within which it must be ratified to become operative upon the ratification of the legislatures of three-fourths of the several states.

(2) VOTER INSTRUCTION TO STATE LEGISLATORS.

(a) The voters instruct each state legislator to vote to apply for an amendment-proposing convention under Article V of the United States Constitution and to ratify the Congressional Term Limits Amendment when referred to the states.

(b) All election ballots shall have "DISREGARDED VOTER INSTRUCTION ON TERM LIMITS" designated next to the name of each state legislator who fails to comply with the terms of subsection (5)(b).

(c) Said ballot designation shall not appear after the Colorado legislature has made an Article V application that has not been withdrawn and has ratified the Congressional Term Limits Amendment, when proposed.

(3) VOTER INSTRUCTION TO MEMBERS OF CONGRESS

(a) The voters instruct each member of the congressional delegation to approve the Congressional Term Limits Amendment.

(b) All election ballots shall have "disregarded voter instruction on term limits" designated next to the name of each member of Congress who fails to comply with the terms of subsection (5)(b).

(c) Said ballot designation shall not appear after the Congressional Term Limits Amendment is before the states for ratification.

(4) VOTER INSTRUCTION TO NON-INCUMBENTS.

The words "DECLINED TO TAKE PLEDGE TO SUPPORT TERM LIMITS" shall be designated on all primary and general election ballots next to the names of non-incumbent candidates for United States senator, United States representative, state senator, and state representative who have not signed the pledge to support term limits unless the Colorado legislature has ratified the Congressional Term Limits Amendment.

The pledge shall read:

I pledge to use all my legislative powers to enact the proposed Congressional Term Limits Amendment set forth in Article XVIII, section 12. If elected, I pledge to vote in such a way that the designation

"DISREGARDED VOTER INSTRUC-TION [ON] TERM LIMITS" will not appear next to my name.

_____.
Signature of Candidate

(5) DESIGNATION PROCESS.

(a) The Colorado secretary of state shall determine these ballot designations. The ballot designation shall appear unless clear and convincing evidence establishes that the candidate has honored voter instructions or signed the pledge in this subsection (4). Challenges to designation or lack of designation shall be filed with the Colorado supreme court within 5 days of the determination and shall be decided within 21 days after filing. Determinations shall be made public 30 days or more before the Colorado secretary of state certifies the ballot.

(b) Non-compliance with voter instruction is demonstrated by any of the following actions with respect to the application or ratification by state legislators, and in the case of members of Congress referring the Congressional Term Limits Amendment for ratification, if the legislator:

(i) fails to vote in favor when brought to a vote;

(ii) fails to second if it lacks one;

(iii) fails to vote in favor of all votes bringing the measure before any committee in which he or she serves;

(iv) fails to propose or otherwise bring to a vote of the full legislative body, if necessary;

(v) fails to vote against any attempt to delay, table or otherwise prevent a vote by the full legislative body or committee;

(vi) fails in any way to ensure that all votes are recorded and made available to the public;

(vii) fails to vote against any change, addition or modification; or

(viii) fails to vote against any amendment with longer limits than the Congressional Term Limits Amendment.

(6) ENFORCEMENT.

Any legal challenge to this section 12 shall be an original action filed with the Colorado supreme court. All terms of this section 12 are severable.